## In Equity.

GEORGE W. MASON et als. *vs.* JOHN P. CARROTHERS et als.

## Cumberland.   Opinion May 28, 1909.

*Corporations.   Promoters.   Fraud by Promoters.   Secret Profits Received by
Promoters.   Action by Stockholders.   Equity.   Revised Statutes,
chapter 47, section 50.*

The promoters of a corporation stand in a fiduciary relation to the corporation itself and to future bona fide purchasers at par of stock from the treasury of the corporation, and when such promoters undertake to sell property to the corporation they are bound to disclose all the facts connected with the transaction.

A promoter of a corporation, whose duty it is to disclose what profits he has made does not perform that duty by making a statement not disclosing the facts, but containing something, which, if followed up by further investigation, will enable the inquirer to ascertain that profits have been made and what they amounted to.

When the promoters of a corporation have received secret profits for which they should account, and it is apparent that an application to the officers of the corporation to take the necessary steps to secure an accounting would be ineffectual, the stockholders may proceed in their own name.

Where the promoters of a corporation made a contract with the corporation and at the time the contract was made the corporation was composed solely of dummy stockholders and directors who were employees of the promoters and who simply carried out the wishes of the promoters, *held* that the promoters were in fact dealing with themselves and not with another.

Where the promoters of a corporation succeeded in transferring to the corporation for $100,000 of its preferred stock and $799,400 of its common stock, certain patent rights which the owners of such rights were ready to transfer to the corporation for $100,000 of its preferred stock and $50,000 of its common stock, and such owners did transfer such rights to the corporation for the less consideration, but the promoters took care that the transfer should be made not directly to the corporation but through themselves as a conduit and that $749,400 of the common stock should adhere to them in transit, *held* that subsequent purchasers of the preferred stock from the treasury paying full cash value therefor and without knowledge of the transaction on the part of the promoters, had a remedy in equity.

Where the persons who promoted a corporation and controlled it through their nominee stockholders and directors, obtained a profit for themselves without revealing the fact to any persons except their associates, and that profit consisted of $549,400 the common stock of the corporation and subsequent bona fide purchasers of stock from the treasury without notice of the profit received by the promoters, brought a bill in equity for a surrender of the stock certificates and the cancellation of the same, *held* that the bill was maintainable and that equity would not allow the stock so received by the promoters to be retained by them nor by any person holding under them with no superior rights.

Revised Statutes, chapter 47, section 50, provides that any corporation may purchase property necessary for its business and "issue stock to the amount of the value thereof in payment therefor . . . and the stock so issued shall be full paid stock and not liable to any further call or payment thereon; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased . . . shall be conclusive." This statute contemplates two independent contracting parties, the one buying and the other selling each looking out for his own interests. It does not contemplate one party dealing with himself and acting in two capacities. It means also the honest and bona fide judgment of the directors.

Where the promoters of a corporation had received secret profits for which they should account, *held* that a master should be appointed to hear and determine the claims of the promoters for services and expenses in promoting the corporation and also to determine the value of certain shares of stock at the time it was issued to them.

The maxim of clean hands applies solely to some wilful misconduct with reference to the matter in litigation and not to some other illegal transaction, although it may be directly connected with the subject matter of the suit.

In equity. On appeal by plaintiffs. Sustained.

Bill in equity by the plaintiffs, eleven in number and all of New York City, holders of preferred Stock in the Marine Safety Appliance Company, a corporation organized under the laws of Maine and located at Portland, Maine, against "John P. Carrothers, of Port Clinton, Ohio, James S. Barcus, of New York City, Willard F. Hallam, of Harpers Ferry, West Virginia," and sixteen others, stockholders in said corporation, and against said Marine Safety Appliance Company, alleging in substance that certain stock issued to certain prior takers had been illegally and fraudulently issued in exchange for certain letters patent, and praying for the surrender and cancellation of the stock so alleged to

have been illegally and fraudulently issued.   Answers were filed by ten of the defendants and the usual replications were filed by the plaintiffs.

A hearing was had on bill, answers, replications and evidence, after which the Justice who heard the cause made a finding of facts, ruled in several matters of law and then filed a decree dismissing the bill, and thereupon the plaintiffs appealed as provided by Revised Statutes, chapter 79, section 22.

The material facts are stated in the opinion.

*Charles E. Gurney,* and *Moses, Morris & Westervelt* (*of the New York Bar*), for plaintiffs.

*Verrill, Hale & Booth,* and *John P. Carrothers,* for defendants, Carrothers, Barcus, Hallam, et als.

*Ernest E. Noble,* for defendant Marine Safety Appliance Company.

SITTING :   WHITEHOUSE, SPEAR, CORNISH, KING, JJ.

CORNISH, J.   Bill in equity brought by bona fide purchasers at par of treasury preferred stock in the Marine Safety Appliance Company, against certain prior takers of common stock alleged to have been illegally and fraudulently issued in exchange for letters patent, and against the corporation, praying for the surrender and cancellation of said certificates.   The cause was fully heard by a single Justice, who, after making exhaustive findings of fact and various rulings in matters of law, made a decree dismissing the bill. The cause is before the Law Court on plaintiffs' appeal from this decree.   The record is voluminous but so far as material to the decision, the facts are these :

In May, 1905, Frank W. Irvine and James T. Lihou were the owners of certain letters patent of the United States covering inventions for handling life boats, and of application for letters patent in the Dominion of Canada.   They met James S. Barcus and Willard F. Hallam, two of the defendants and after various negotiations, a written contract was entered into at Washington, D. C., on July 10, 1905, between Barcus and Hallam on the one part

and Irvine and Lihou on the other, whereby Barcus and Hallam agreed to cause a corporation to be organized within four months (subsequently extended six months) for the purpose of manufacturing and selling said life boat handler in the United States and Canada, with a capital stock of one million dollars, two hundred thousand of which was to be six per cent cumulative preferred stock and eight hundred thousand common stock. Barcus and Hallam further agreed to cause the corporation to do the following acts: to issue to Irvine and Lihou one hundred thousand dollars paid up and non-assessable preferred stock at par and fifty thousand dollars paid up and non-assessable common stock at par; to enter into a contract to pay Irvine and Lihou a royalty of ten per cent on the gross receipts from the sales of the life boat handler; and to make an advance payment of ten thousand dollars on royalty account. Barcus and Hallam also agreed to personally pay twenty-five hundred dollars thereof immediately, the balance, seventy-five hundred dollars, to be paid by the corporation, Irvine and Lihou assigning to Barcus and Hallam their interest in the royalty contract.

Irvine and Lihou agreed to transfer to the corporation, in consideration of the foregoing, all their rights in the patents, on receipt of the stock and the ten thousand dollar advance payment on royalties. In case of failure to have the stock issued and the ten thousand dollars paid, Barcus and Hallam were to forfeit all rights in the premises, including all money advanced by them before the completion of the contract, and all compensation for services already rendered and to be rendered in connection with the enterprise.

It was further stipulated that a copy of this contract together with an assignment of the patents should be placed in escrow with a Trust Company in Washington, to be delivered to Barcus and Hallam upon the payment of the remaining seventy-five hundred dollars on or before November 1, 1905.

On November 13, 1905, Barcus and Hallam caused the Marine Safety Appliance Company to be organized under the laws of Maine for the purposes and with the capital stock previously agreed upon.

There were six incorporators, each subscribing for one share of common stock, one being the attorney of Barcus and Hallam residing in Boston, three being employees in their New York office, and two residents of Maine used as a convenience. The attorney and the two residents of Maine were elected Directors at the first meeting but one of the latter resigned as soon as the organization was perfected and one of the employees was elected in his stead. On November 17, 1905, the attorney director and the employee director held a meeting at the office of Barcus and Hallam in New York, at which the attorney director and the remaining Maine director also resigned and two other employees were substituted. This left the entire board of directors, employees of Barcus and Hallam.

After this organization was completed, and at this same meeting of November 17, 1905, Barcus and Hallam, representing themselves to be the exclusive owners of these patent rights, offered to sell the same to the corporation in consideration of $100,000 of the full paid and non-assessable preferred stock and $799,400 of the full paid and non-assessable common stock of the corporation at par, being all the common stock except the six shares subscribed for by the dummy incorporators and directors, and of a ten per cent royalty agreement and a ten thousand dollar advance royalty payment in cash, the terms of the royalty agreement being similar to those in the July 10 contract between Barcus and Hallam, and Irvine and Lihou. The directors with what the single Justice aptly terms "a grave and eloquent mummery of whereases," accepted the proposal and voted to make the purchase.

Thereupon Barcus and Hallam executed an assignment of all right, title and interest in the letters patent to the corporation, the royalty contract was executed and the requisite certificates of preferred and common stock were made out in the names of Barcus and Hallam but were retained by the treasurer. On the following day another directors meeting was held and Barcus and Hallam in consideration of the corporation note of $5000, retransferred and gave back to the corporation $200,000 of the common stock, to be used as a bonus in its sale of the remaining $100,000 of preferred stock. They also split up their certificates and carved out $50,000 common

stock for which certificates were written in the name of Irvine and Lihou, but none of the certificates were delivered before December 12, 1905.   On that date Barcus and Hallam on the one part and Irvine and Lihou, on the other, or their representatives, met in New York, and reached a settlement of their affairs.   Barcus and Hallam delivered to Irvine and Lihou $100,000 of the preferred stock and $50,000 of the common stock, certificates for which had been written November 18, and assigned to them the royalty contract made between the corporation and Barcus and Hallam on November 17, and instead of the $10,000 advance royalty payment, Irvine and Lihou accepted part cash and part notes of the corporation.   The corporation at the same time delivered to Barcus and Hallam the remaining $549,400 of common stock.

Irvine and Lihou then acknowledged and delivered to Barcus and Hallam, instead of to the corporation, an assignment of their interest in the patents, which on November 17, Barcus and Hallam had conveyed to the corporation, the assignment from Irvine and Lihou bearing date July 10, 1905, though not acknowledged until December 12, 1905.   This left $100,000 of the preferred stock in Irvine and Lihou, and $100,000 in the treasury; $50,000 of the common stock in Irvine and Lihou, $549,400 in Barcus and Hallam, $600 in the dummy incorporators and $200,000 in the treasury to be used as a bonus in the sale of the preferred stock. The number of directors was increased on January 8, 1906 from three to nine, and Barcus and Hallam were two of the number, so that with the three employees they still had  a majority of the Board.

The plaintiffs became stockholders between November 18, 1905, and February 13, 1906, by the purchase of preferred stock at its par value from the corporation itself, the stock being a part of the $100,000 not issued to Barcus and Hallam, and they received as a bonus two shares of common stock for each share of preferred.   The active plaintiffs hold $5800 of such preferred stock and ask to represent other holders not appearing as parties plaintiff, making a total of $11500, being all the preferred stock issued for cash.   In June, 1906, Barcus and Hallam assigned to the defendant Carrothers

all interest in the stock held by them in consideration that he would push the business of the company and carry out an agreement previously made with a Cleveland syndicate so called, which is immaterial here, and Carrothers now holds the same, although it has never been transferred to him on the books of the corporation. However, he was familiar with the whole history of the stock issue and was held by the sitting Justice not to be a bona fide purchaser for value but chargeable with notice of any imperfection in the title to the stock and of any illegality in its issue, to the same extent that Barcus and Hallam would be and that finding we approve. Carrothers has no rights superior to Barcus and Hallam. This bill was filed March 1, 1907.

It is unnecessary to go into the facts with greater detail. Enough has been outlined to make clear the single decisive issue which is, the right of the plaintiffs to secure a return to the treasury and a cancellation of all the shares of common stock issued to Barcus and Hallam on November 17, 1905 in excess of the $50,000 turned over by them to Irvine and Lihou in accordance with the original agreement of July 10, and of the $200,000 turned back to the treasury for corporate uses. Have the plaintiffs under the facts of this case a right to require these defendants to return to the corporation this $549,400 of common stock as an unjust enrichment which equity will not allow them to retain?

The single Justice dismissed the bill on the ground that the plaintiffs did not seek an accounting for secret profits of officers or promoters but asked relief on two other grounds, both of which he held to be untenable, first, that Barcus and Hallam had no title whatever to the patents which they attempted to assign on November 17, 1905, so that there was no consideration for the issue of stock to them ; and second, that inasmuch as Barcus and Hallam held for the benefit of the corporation the contract with Irvine and Lihou by which the corporation was entitled to an assignment of the patents in consideration of $100,000 preferred and $50,000 common stock, the issue of the additional $749,400 of common stock to Barcus and Hallam was a fraud upon the corporation and the stockholders existing and subsequent. The conclusion as to owner-

ship should be adopted.   There was a conflict of evidence as to whether the assignment from Irvine and Lihou to Barcus and Hallam was actually made and delivered on July 10, 1905, its date, or on December 12, 1905, the date of its acknowledgment, and had been dated back to July 10, for a purpose.   The single Justice, however, found as a fact that Barcus and Hallam had an equitable if not a legal title to the patents on November 17, 1905, when they made a conveyance to the corporation and his finding should stand unless clearly wrong.   *Paul* v. *Frye*, 80 Maine, 26 ; *Hartley* v. *Richardson*, 91 Maine, 424 ; *Proctor* v. *Rand*, 94 Maine, 313.   The evidence and the circumstances warrant the finding.   But in reaching the conclusion on the second point, the fiduciary relation between promoters and subsequent purchasers of treasury stock was lost sight of.   The sitting Justice held that Barcus and Hallam on the one side and Irvine and Lihou on the other were the only persons interested in the corporation, the interest of the dummy stockholders of course not deserving consideration ; that whatever issue of stock was then agreed to or subsequently ratified, would be legal as to them, whether the consideration was worth the par value or not, or was so judged by the directors or not, and that subsequent stockholders could not maintain a bill for the cancellation of the stock. This is undoubtedly correct so far as Irvine and Lihou are concerned. It would be correct as to subsequent stockholders who might purchase from the promoters or from Irvine and Lihou stock already issued, but it is not correct as to those who might without notice purchase directly from the treasury, because it ignores the fiduciary relation between promoters and such future purchasers.   Were Barcus and Hallam simply strangers, dealing with an independent corporate body and making the best sale they could, it might be doubtful whether a future purchaser of stock could disturb the transaction in absence of actual fraud.   That question, however, we are not called upon to decide.   Here the parties selling are the promoters, and the parties buying are not the existing dummy stockholders but the future real stockholders whose cash alone will go into the treasury of the corporation and enable it to begin and carry on business. The purpose of the bill was therefore misinterpreted.   The plaintiffs

do seek an accounting for secret profits of promoters, not in cash, because no cash was paid by the corporation nor has since been received by the promoters in the sale of their stock, but in restitution of the stock itself which the promoters secured from the treasury in violation of their trust, and which has not yet reached the hands of bona fide purchasers for value. It is on that ground that the bill should be sustained. The allegations in the bill and the facts proved are ample to warrant it.

It needs no argument to show that Barcus and Hallam were promoters of the corporation in the legal sense of the term. Am. and Eng. Ency. of Law, Vol. 23, page 232-3. The six incorporators who subscribed for only one share each of common stock had no real interest in the corporation but were nominees of Barcus and Hallam, four being in their employ. They were in the corporation simply to represent and act for the promoters and to do their bidding, and their stock if paid for at all was doubtless paid for by the promoters. The three shares issued to the attorney and the two residents of Maine were transferred to Barcus on December 15, one month after their issue. The corporation was not only created but manned by the promoters: it was in fact the promoters in a corporate guise, and it is the privilege as well as the power of the court in equity to remove the mask. With this ingeniously devised and smoothly working machinery the promoters experienced no difficulty in transferring to the corporation for $100,000 preferred and $799,400 common stock, the same rights which Irvine and Lihou stood ready to transfer for $100,000 preferred and $50,000 common, and which in fact Irvine and Lihou did transfer to the corporation for the less consideration, the promoters taking care that the transfer should be made not directly to the corporation but through themselves as a conduit, and that $749,400 of the common stock should adhere to them in transit. Have subsequent purchasers of preferred stock from the treasury paying full cash value therefor and without knowledge of this transaction no remedy under such circumstances? This question is of importance not merely to the parties in interest but to the general public in these days of frequent corporate promotion.

That a promoter of a corporation stands in a fiduciary relation to the corporation itself and to future stockholders therein is well settled. The leading English case is *Erlanger* v. *New Sombrero Phosphate Co.*, L. R. 3 App. Cas. 1298, where the subject is exhaustively discussed and the wholesome equitable doctrine firmly established. See also *In re Olympia*, L. R. 2 Ch. Div. (1898), page 153. The courts of this country have taken the same position whenever the question has been raised. The burden imposed upon promoters growing out of this fiduciary relation is clearly expressed in *Pietsch* v. *Milbrath*, 123 Wis. 647, 107 Am. St. Rep. 1017, as follows :

"If one or more persons acquire property, intending to promote the organization of a corporation to purchase it from them at a profit to themselves and effect such purpose, limiting the membership to interested parties till the transaction is completed between them and the corporation, intending thereafter to cause the balance of the capital stock to be sold to outsiders, they being kept in ignorance of the true nature of such transaction, and effecting such intent, they are guilty of actionable fraud upon the corporation and responsible to it for the gains made. In such circumstances, in the making of the contract between the corporation and its agents, it is mere fiction as to its prospective members by original subscription. Since it has no one to stand for it as an adverse party in the transaction, no meeting of adverse minds, essential to a binding contract, occurs. The corporation is deceived, in that advantage is taken of its incapacity to protect itself, as to the interests of prospective memberships by the original taking of its stock." To the same effect are *Pittsburg Mining Co.* v. *Spooner*, 74 Wis. 307, 17 Am. St. Rep. 149, and note 161-8 ; *Plaquemines Tropical Fruit Co.* v. *Buck*, 52 N. J. Eq. 230 ; *Densmore Oil Co.* v. *Densmore*, 64 Penn. St. 43 ; *Burbank* v. *Dennis*, 101 Cal. 90 ; *South Joplin Land Co.* v. *Case*, 104 Mo. 572 ; *Hayward* v. *Leeson*, 176 Mass. 310 ; *Old Dominion Copper Co.* v. *Bigelow*, 188 Mass. 315, and see *Lomita Land & Water Company* v. *Robinson*, 97 Pac. Rep. 10, and full note in same ; 18 L. R. A. N. S. 1106.

This court has laid down the same doctrine in this unequivocal language in a very recent case.

"It may be conceded, for it is well settled and true, that promoters of a corporation stand in a fiduciary relation to the corporation, to its subscribers for stock and to those who it is expected will afterwards buy stock in the corporation. The promoters owe to them the utmost good faith. If they undertake to sell their own property to the corporation they are bound to disclose the whole truth respecting it. If they fail to do this, or if they receive secret profits out of the transaction, either in cash or by way of allotments of stock, when there are other stockholders, or it is expected that there will be other stockholders, undoubtedly the corporation may elect to avoid the purchase ; or it may hold the promoters accountable for the secret profits, if in cash, or may require a return of the stock if unsold, or if sold, an accounting for the profits of its sale." *Camden Land Co.* v. *Lewis*, 101 Maine, 78-95.

The case at bar falls within the ample scope of this rule. This bill is brought not to rescind the sale but to "require a return of the stock" "received as secret profits" by the promoters when they sold "their own property to the corporation" without "disclosing the whole truth respecting it" as they were "bound" to do. The necessary elements concur for its maintainance, the relations of the parties, the failure to disclose the whole truth concerning the property to the real parties in interest, the secret profits and the injury.

Had Barcus and Hallam been dealing with a stranger they could have asked any price they pleased and they would have been under no legal obligation to state the cost. "On the other hand, if they elected to make a sale of it to one standing to them in a fiduciary relation they were under an obligation to make a full disclosure to the beneficiary of all the facts known to them to be material to the property and the purchase, or to see to it that the fiduciary had adequate independent advice. That is an obligation resting upon every fiduciary who makes a sale of his own property to the beneficiary, no matter whether it is a case of trustee and cestui que trust, guardian and ward, solicitor and client or promoter of a corpora-

tion and the corporation itself." *Old Dominion Copper Co.* v. *Bigelow*, 188 Mass. 315, 322.

Such disclosure was not made here. That the promoters were turning over to the corporation through themselves, rights for which they were paying but one-tenth of the consideration was carefully concealed from the purchasing public, for the purchasing public as well as the corporation are deemed beneficiaries, and here they were the sole beneficiaries as the corporation itself was a mere farce. The defendants, however, say that there was no attempt at concealment, as the whole transaction was spread upon the records of the corporation where the intending purchaser could ascertain the facts. Were that true there would be merit in the defendant's claim, for perhaps in no better way could the information be given to an unknown body of purchasers than by recording it where it would be open to the inspection of all interested parties. But the records here are absolutely silent as to any contract with Irvine and Lihou, by which they agreed to assign the patent rights to the corporation for the smaller consideration. They show with suspicious detail the transaction between the corporation and Barcus and Hallam, but Irvine and Lihou appear only as transferee stockholders from Barcus and Hallam. The full transaction was not disclosed and the promoters' profits were certainly kept secret so far as the purchasing public was concerned. "A promoter of a corporation, whose duty it is to disclose what profits he has made does not perform that duty by making a statement not disclosing the facts, but containing something, which, if followed up by further investigation, will enable the enquirer to ascertain that profits have been made and what they amounted to." *In re Olympia*, L. R. 2 Ch. Div. (1898) 153-166. Considering all the facts therefore, this would seem to be a case calling for equitable intervention, where good morals reinforce sound law, and the two work together to undo an attempted fraud.

Various defenses are interposed and these will be considered seriatim.

First. It is contended that under the Maine Statute the transaction was valid unless there was actual fraud. R. S., ch. 47, sec. 50, provides that any corporation may purchase property necessary for

its business and "issue stock to the amount of the value thereof in payment therefor . . . and the stock so issued shall be full paid stock and not liable to any further call or payment thereon ; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased . . . shall be conclusive." This contemplates two independent contracting parties, the one buying and the other selling, each looking out for his own interests. It does not contemplate one party dealing with himself and acting in two capacities. It means also the honest and bona fide judgment of the directors and the facts here negative the idea that even these dummy directors were of the honest and bona fide opinion that the patent rights were worth the price paid, when there was in existence a contract to convey the same property to them for $50,000 instead of $799,400 of common stock. The sitting Justice so found. But this case does not proceed on that theory. It is not brought by a creditor to compel payment by a stockholder for stock up to par, nor by an existing stockholder to compel cancellation of stock illegally issued. The transaction is challenged because of the breach of the fiduciary relationship existing between the seller and the buyer and the consequent fraud upon future stockholders. A similar point was raised in *Hayward* v. *Leeson*, 176 Mass. 310, and the court answer it as follows : "But even if they did so believe and their belief was honest, and there was a foundation for that honest belief, they were none the less guilty of fraud. It is a fraud for promoters to undertake to decide for the future stockholders in the corporation to be organized that one third of the whole capital stock of that corporation is a fair remuneration for their services as promoters, to issue one third of the capital stock to themselves as such remuneration and then to invite the public to subscribe to the stock of the corporation without disclosing the fact to the subscribers and without getting their consent to the payment of the remuneration." It is equally a fraud for promoters to issue to themselves three-quarters of the capital stock in excess of the contract price of property conveyed.

Second. The defendants rely upon a line of cases cited as holding that if such a transaction is agreed to by all the stockholders existing

at the time, even though they be dummy stockholders, no fraud is committed upon the corporation and the corporation itself cannot rescind. *Blum* v. *Whitney*, 185 N. Y. 232, 77 N. E. 1159; *Tompkins* v. *Sperry, Jones & Co.*, 96 Md. 560, 54 At. Rep. 254; *Foster* v. *Seymour*, 23 Fed. Rep. 65; *McCracken* v. *Robison*, 57 Fed. Rep. 375; *Old Dominion Copper Mining Co.* v. *Lewisohn*, 136 Fed. Rep. 915, 148 Fed. Rep. 1020, 210 U. S. 206. These cases, however, with the exception of *Old Dominion Copper Mining Co.* v. *Lewisohn*, do not support the contention.

In *Blum* v. *Whitney*, supra, there was a consolidation of various constituent corporations and alleged stock jobbing operations resulted in profits to the manipulators. But the court in denying relief expressly stated that the facts of that case did not bring it within the law governing promoters, and that the rights of the public were not involved. In *Tompkins* v. *Sperry, Jones & Co.*, supra, all the stock and bonds were issued to the defendants, and any subsequent purchasers of stock purchased from the defendants and not the corporation. "The public were not invited to subscribe to any stock." The distinction between that case and those in line with *Erlanger* v. *New Sombrero Phosphate Co.*, 3 App. Cas. 1218 is noted and the court expressly state that there is no conflict between them. The underlying principle is recognized in these words.

"The true test of the responsibility of parties occupying positions such as Sperry and Jones did, in putting the brewing properties into the company in this case, is whether other persons than themselves hold stock in the company, and are not made aware of the true state of facts, or are induced to come into it by concealment or misrepresentation of the facts, or have furnished all or part of the capital embarked in the enterprise, and are misled or kept in the dark as to the actual transaction. In other words, the ground of their liability is the concealment or misrepresentation by those whose duty it is, by virtue of their relation to the other persons interested in the transaction, to make a full disclosure. It is a misuse of terms in the present case to say that Sperry and Jones stood in a fiduciary relation to the company at the time they made the contracts with the brewers, or when they turned the property into the company in

payment for its stock and bonds.   They, at that time, held all of its stock, and were the sole owners of the company.   They were, in equity, the company itself.   *Swift* v. *Smith, Dixon & Co.*, 64 Md. 428, 5 Atl. 534.   There was no invitation to others to subscribe for the stock."

In *Foster* v. *Seymour*, 23 Fed. Rep. 65, and *McCracken* v. *Robison*, 57 Fed. Rep. 375, all the stock had likewise been issued to the promoters and directors in payment of the property sold, and therefore the transaction was acquiesced in by all those then interested and who might be interested in the corporation, except third parties who might purchase from the promoters and directors. Such third parties would be bound by the acquiescence of their vendors, and the corporation would be bound by the acquiescence of all its stockholders.   Upon the authority of these last two cases, which lack the distinguishing element of future bona fide purchases of stock directly from the treasury, the Federal Court in *Old Dominion Copper Mining Co.* v. *Lewisohn*, 136 Fed. Rep. 915, where the corporation itself sought to rescind the sale or recover damages, extended the doctrine to a case where only a part of the stock was issued to the promoters and the balance to the public and held that the corporation had no remedy, and this decision has been affirmed by the Circuit Court of Appeals in 148 Fed. Rep. 1020, and by the Supreme Court of the United States, in 210 U. S. 206.   This case stands upon its own authority and is in direct conflict with the decision of the Supreme Court of Massachusetts on precisely the same facts in *Old Dominion Copper Co.* v. *Bigelow*, 188 Mass. 315, before cited.   The reasoning of Mr. Justice Holmes speaking for the former court is as follows:

"The difficulty that meets the petitioner at the outset is that it has assented to the transaction with the full knowledge of the facts.   .   .   .   .

"At the time of the sale to the plaintiff, then, there was no wrong done to any one.   Bigelow, Lewisohn, and their syndicate were on both sides of the bargain, and they might issue to themselves as much stock in their corporation as they liked in exchange for their conveyance of their land.   *Salamon* v. *A. Salamon & Co.*,

(1897) A. C. 22; *Blum* v. *Whitney*, 185 N. Y. 232, 77 N. E. 1159; *Tompkins* v. *Sperry*, 96 Md. 560, 54 Atl. 254. If there was a wrong, it was when the innocent public subscribed. But what one would expect to find, if a wrong happened then, would not be that the sale became a breach of duty to the corporation nunc pro tunc, but that the invitation to the public without disclosure, when acted upon, became a fraud upon the subscribers from an equitable point of view, accompanied by what they might treat as damage. For it is only by virtue of the innocent subscribers position and the promoter's invitation that the corporation has any pretense for a standing in court. If the promoters, after starting their scheme, had sold their stock before any subscriptions were taken, and then the purchasers of their stock, with notice, had invited the public to come in, and it did, we do not see how the company could maintain this suit. If it could not then, we do not see how it can now." . . . .

"It is assumed in argument that the new members had no ground for a suit in their own names, but it is assumed also that their position changed that of the corporation, and thus that the indirect effect of their acts was greater than the direct; that facts that gave them no claim gave one to the corporation because of them, notwithstanding its assent. We shall not consider whether the new members had a personal claim of any kind, and therefore we deal with the case without prejudice to that question, and without taking advantage of what we understand the petitioner to concede."

In *Old Dominion Copper Co.* v. *Bigelow*, 188 Mass. 315, the Supreme Court of Massachusetts carefully analyzed and distinguished all the cases cited by Justice Holmes as authorities and reaffirmed the decision in *Hayward* v. *Leeson*, 176 Mass. 310, where a corporation was allowed to recover secret profits from its promoters, who invited the public to purchase stock without apprising them of the fact that one-third of the entire capital had been issued to themselves as a remuneration for their services. Were the pending bill brought in the name of the corporation it would be necessary for this court to choose between these two decisions, and adopt the one best fortified by reason and authority. But that is unnecessary

here, as this bill is brought by the persons actually defrauded, the subsequent bona fide purchasers of the stock.

Without discussing therefore the reasoning in these antagonistic decisions, it is sufficient here to say that the Supreme Court of ·Massachusetts in case only a part of the stock has been issued, grants a remedy to the corporation itself and impliedly to the subsequent purchasers of treasury stock; while the Supreme Court of the United States denies it to the corporation, but intimates that subsequent, purchasers might have the right, because they are the parties who are wronged. Both courts recognize the transaction as a fraud on subsequent purchasers of treasury stock and the case at bar, though perhaps the first one to apply the remedy directly in behalf of such purchasers, is clearly within the equitable principles that have been heretofore recognized. It would be strange indeed if the parties defrauded cannot be the parties plaintiff.

Third. , That the plaintiffs have themselves received two hundred per cent of common stock as a bonus for their preferred and must therefore be held to have acquiesced in all that went before. But the plaintiffs cannot be held to have acquiesced in what they had no knowledge of, and those who were called as witnesses testified that they had no knowledge whatever of the past transactions. The burden of proving such knowledge was on the defendants. It appears that the stock was sold through agents employed by the dummy directors on most extravagant terms, one agent receiving a salary of twenty dollars per week, twenty-five per cent commission, and $30,000 of common stock in case he sold $5000 of preferred. Such agents would not be likely to reveal more than they deemed advisable, certainly not anything throwing suspicion upon previous methods of stock issue.

Fourth. That the plaintiffs do not come into court with clean hands; that another corporation, known as the Irvine Life Boat Handler Co. has been formed by Irvine and his associates, a majority of its board of directors being included among the plaintiffs; that this corporation has acquired a lease of the patents from the Marine Safety Appliance Co. and the plaintiffs have received from Irvine share for share in the new Company as a gift. Irvine

says that this was done to protect the preferred stockholders, but whatever its purpose, a careful study of the transaction fails to reveal anything soiling the hands of these plaintiffs and preventing their pursuing their equitable rights in the pending cause. The single Justice so found. The maxim of clean hands applies solely to some wilful misconduct with reference to the matter in litigation and not to some other illegal transaction, although it may be indirectly connected with the subject matter of the suit. *Yale Gas Stove Co.* v. *Wilcox*, 64 Conn. 101.

Fifth. That any wrong done, was to the corporation itself, and that remedy should have been sought in the name of the corporation and not of the stockholders. It is undoubtedly true that a bill in equity by a stockholder against a corporation charging that the directors have acted ultra vires and contrary to law will not ordinarily be sustained unless the corporation is shown to be unwilling or incapable of seeking the remedy for itself. *Dunphy* v. *Traveller Newspaper Association*, 146 Mass. 495; *Ulmer* v. *Real Estate Co.*, 93 Maine, 324; *Wells* v. *Dane*, 101 Maine, 67. But a rule ceases when the reason therefor ceases, and the law does not require a useless ceremony to be performed before relief can be granted. If it is apparent from the evidence that application to the officers of the corporation to take the necessary steps would be ineffectual the shareholders may proceed in their own name. In the case at bar it is true that the plaintiffs constituted a majority of the board of directors at the time this bill was filed, but had they taken this step in the name of the corporation it is evident that the defendants, controlling a large majority of the stock would speedily have held a stockholders meeting and have suppressed the proceeding. Their attitude of resistance to the bill when brought is conclusive proof of what it would have been had they been asked to take the initiative. The object of the rule is to prevent a single stockholder from harassing a corporation or its officers by citing it or them into court for every real or fancied grievance. If aggrieved he must seek his remedy through corporate channels. But that reason does not prevail here. The plaintiffs are attempting to secure relief which the evidence shows could not be obtained through

corporate channels and they therefore have a standing in this court. This exception is as well recognized as the rule itself. *Ulmer* v. *Real Estate Association, Wells* v. *Dane,* supra. Moreover the corporation is made a party defendant and this suit is brought in behalf of all holders of preferred stock, so that all parties are before the court.

Finally, that it would be inequitable to leave the promoters Barcus and Hallam without any compensation for services rendered and expenses incurred in connection with the promotion and development of the corporation and its business. There is merit in this contention and exact justice can be done these parties by the appointment of a master to hear and determine the claims of Barcus and Hallam for services and expenses and also to determine the value of the preferred and common stock at the time it was issued to them and upon the report of said master, the court to take such further action and make such further decree as the rights of all parties may require.

The entry must therefore be,

> *Appeal sustained.*
>
> *Bill sustained, with one bill of costs against James S. Barcus, Willard F. Hallam and John P. Carrothers, and the Marine Safety Appliance Company.*
>
> *Bill dismissed as to the other defendants with one bill of costs for such defendants.*
>
> *Master to be appointed by the single Justice.*
>
> *Decree in accordance with this opinion.*