## Edwin W. Abbe et al., Appellants, v. Archie M. Andrews et al., Appellees.

### Gen. No. 30,178.

1. EQUITY—*multifariousness of stockholders' bill joining cause of action against promoters fraudulently inducing purchase of stock and cause of action against creditors' committee for negligent failure to protect interests of corporation.* Where subscribers to the stock of a corporation, in a bill against the promoters and officers thereof and the members of a creditors' committee formed from the directorate of the corporation, seek rescission of their stock subscriptions on the ground that the same were procured by fraud, and in the same bill ask recovery against the members of the creditors' committee because of their negligent failure to compel restitution by the promoters to the corporation of the proceeds of such fraudulently induced subscriptions, a demurrer to the bill on the ground of multifariousness was properly sustained, notwithstanding that it was further alleged that said committee ratified and approved such fraudulent conduct.

2. EQUITY—*multifariousness of bill demurrable as to part of defendants on ground of laches or bar of statute.* A bill in equity is properly dismissed as multifarious where it appears that the same is demurrable as to a part of the defendants therein for laches or because action is barred by the statute of limitations.

3. LIMITATION OF ACTIONS—*demurrer to bill in equity as basis for presenting defense of limitations.* In the absence of an equitable excuse alleged in a bill to avoid the bar of the statute of limitations, such defense may be urged upon demurrer to the bill where the bar appears upon the face thereof.

4. CORPORATIONS—*bar of suit in equity against creditors' com-*

*mittee ratifying fraudulent acts of promoters.* Where members of a creditors' committee of a corporation, sought to be held jointly responsible with promoters thereof for alleged fraudulent acts whereby complainants were induced to become subscribers to the stock of such corporation, did not become connected with such corporation until after the accomplishment of such fraudulent purpose, and were chargeable, if at all, upon the ground of subsequent ratification of such fraudulent acts, such committee members were entitled to set up laches or the bar of the statute of limitations as a defense to the bill.

5. Equity—*dismissal of bill on demurrer for multifariousness in absence of application for leave to amend.* Where complainant, after his bill was held demurrable for multifariousness as to part of the defendants, failed to apply for leave to dismiss the bill as to such defendants, the same was properly dismissed for want of equity.

Appeal by plaintiffs from the Circuit Court of Cook county; the Hon. Hugo M. Friend, Judge, presiding. Heard in the second division of this court for the first district at the March term, 1925. Affirmed. Opinion filed December 8, 1925. Rehearing denied December 21, 1925.

James W. Cutshaw and George W. Plummer, for appellants.

Louis J. Behan, William J. Corrigan, Stebbins, Garey, L'Amoreaux & Hurtubise, Gann, Secord & Stead and Culver, Andrews & King, for appellees; Loy N. McIntosh and Mack C. Wylie, of counsel.

Mr. Justice Fitch delivered the opinion of the court.

By this appeal, complainants seek to reverse a decree dismissing their bill for want of equity after demurrers thereto had been sustained.

The bill, as amended, covers 160 typewritten pages. There are 1,612 complainants and 38 defendants. The complainants are all alleged to be "original subscribers, purchasers and allottees of Smith Motor Truck Corporation stock, purchased direct from the defendants or their agents." The bill states that they sue

"as a Voluntary Association, comprising a class," in their own behalf and on behalf of all others similarly situated who may join in the suit, that they are "similarly aggrieved," that their suit is based upon the same state of facts, and that the relief to which they deem themselves entitled is also identical; that their suit is a personal action "for the rescission of said subscription contracts" and the recovery of their purchase money, with interest.

The defendants are, first, certain promoters, viz.: J. M. Hoyt, C. B. Little, E. I. Rosenfeld, Andrews & Co., a "Trust Estate," and its three "Trustees," and three persons alleged to be partners doing business under the firm name of Michaelis & Company; second, the Smith Motor Truck Corporation, "now bankrupt and defunct," its receiver and trustee in bankruptcy, "now discharged," and the Dearborn Truck Company, its "successor," which bought the assets of the corporation at the bankruptcy sale; third, a "representative" stockholder; fourth, a "representative" creditor, and fifth, 21 persons who were at some time directors or officers of the corporation, including the members of a creditors' committee who also acted as directors for a time. The bill prays for a decree permitting complainants to rescind and cancel all their contracts for the purchase of stock, on the ground of fraud, and that the defendant promoters, directors and officers be held to be "trustees *ex maleficio*" and be required to pay into court the full amount of the purchase money paid by complainants for their stock, with interest, to be equitably distributed, under the direction of the court, to the complainants as their interests may appear. The bill expressly states that none of its allegations of conspiracy, misrepresentation, fraud and deceit "are directed against the corporation, the receiver, stockholders, creditors or other claimants," and that "no affirmative relief is demanded of them or any of them."

The bill alleges that in September, 1915, the defendants Smith and Rosenfeld, both of whom "were without funds," organized a corporation called "Smith Form-a-Truck Company" (which is thereafter referred to as the "old company") under the laws of Delaware, with an authorized capital of $100,000, purchased a manufacturing site at Clearing, Illinois, and began the manufacture of a device for converting small motor cars into light commercial trucks, which business was so prosperous from the beginning that in less than one year it was able "to show an audit of approximately $600,000 in assets"; that during 1916 the defendants Hoyt and Little became associated with the defendant Rosenfeld in the enterprise, and thereupon "the defendant promoters" conceived and began executing a "well-defined scheme, plan and device to cheat and defraud the public"; that on November 13, 1916, Hoyt, Little and Rosenfeld entered into a contract with the defendants Michaelis & Company and A. M. Andrews, styled in the bill a "preorganization agreement," which is set out in full in the bill, which they carried out "and thereby succeeded in victimizing about 4,000 persons, including the complainants, to the extent of nearly six million dollars."

The agreement thus quoted provides, in substance, that Hoyt, Little and Rosenfeld shall cause to be organized under the laws of Virginia, a corporation to be called "Smith Motor Truck Corporation" (thereafter referred to as the "new corporation"), with an authorized capitalization of $14,000,000, of which $2,000,000 is to be preferred stock and the remainder common stock, and to cause to be transferred to the new corporation all the capital stock of the old company, or all its assets, and also to pay to the new corporation $830,000 in cash, in consideration of the issue to them by the new corporation of $1,400,000 par value of its preferred stock, and $10,000,000 par value of its common stock; that Andrews and Michaelis & Company

agree to buy from Hoyt, Little and Rosenfeld all of such preferred stock and half of such common stock for $1,530,000, payable in specified instalments during the succeeding three months "at the rate of $15.30 for each $14.00 par amount of preferred stock" upon delivery of stock certificates in the proportion of 500 shares of common stock to 14 shares of preferred stock; and that out of such payments Hoyt, Little and Rosenfeld shall pay to the new corporation "when and as received" by them from Andrews and Michaelis, 83/153 of the total amount so paid, "for working capital." The agreement further provides that Andrews and Michaelis & Company shall name three of the seven directors of the new corporation and one member of the executive committee, and that the remaining $600,-000 par value of preferred stock and $2,000,000 par value of common stock shall be deposited with a trust company to prevent the sale thereof without the consent of Andrews and Michaelis.

The bill then alleges that pursuant to that agreement, a charter was obtained for the new corporation, with an authorized capital of $14,000,000, and a minimum capital of $3,000; that three dummies, selected by Hoyt, Little and Rosenfeld, subscribed for the necessary minimum amount of stock, which subscription was afterward credited as a payment on the stock of Hoyt; that these subscribers then held a stockholders' meeting and elected seven dummy directors, named by Hoyt, Little and Rosenfeld, none of whom had any interest whatever in the corporation except the amount they received for their services from Hoyt, Rosenfeld and Little, and to those directors Hoyt presented a written proposition to subscribe for $11,997,000 par value of preferred and common stock in the new corporation, and to pay such subscription by turning over to the new corporation all of the capital stock of the old company, and also paying $830,000 in cash "if, as and when received" from the sale of the stock so subscribed for,

which offer of Hoyt was at once accepted, and, a few days later, a meeting of the board of directors was held in New York, at which all the dummy directors except one resigned and in their places the defendants Hoyt, Little, Rosenfeld, and three others were elected directors, and the defendants Hoyt, Rosenfeld and Little were constituted the executive committee of the board.

The bill charges that the sale of stock of the new corporation in this manner to Andrews and Michaelis & Company, as provided for by the preorganization agreement, "was wholly fictitious, and was made with the understanding that Hoyt, Little and Rosenfeld should secure possession of the highly diluted promotion stock," and that Andrews and Michaelis should dispose of the same and divide the proceeds among all the parties according to the terms of that agreement; that this was done in furtherance of a conspiracy to cheat and defraud prospective purchasers of stock, "and constituted the legal trappings, the settings and the prelude to the contemplated hurricane stock-selling campaign about to be inaugurated"; that in effect the buyers and sellers were the same persons, and such sale and exchange of stock were unlawful and void; that none of the assets or physical property of the old company was ever delivered to the new company, but that the former retained its corporate identity and continued to transact business as before, and that the only assets of the new corporation, received in exchange for its issue of $1,400,000 preferred and $10,000,000 common stock to Hoyt and his associates, was the capital stock of the old company, of the par value of $100,000, and an alleged lease which was afterwards repudiated and abrogated.

The bill further alleges that upon completing the organization of the new corporation in this manner, "the defendant promoters inaugurated a gigantic stock-selling campaign, which included every section of the United States, for the purpose of unloading on the

public the said wholly worthless privately owned promotion stock''; that the promoters "appropriated the greater portion, probably eighty-five per cent or more, of the proceeds of the sale of said stock,'' the exact amount thereof being unknown to complainants; that the defendant promoters, officers and directors occupied a fiduciary relation to subscribers and purchasers of stock, and it was their duty to disclose to complainants and other "subscribers" and purchasers of such stock, the actual facts regarding the acquisition of such stock by the promoters, but they disregarded that duty and their relation of trust and confidence, and while pretending and representing that they were agents of the corporation, selling stock owned by it, they were in fact acting as principals, selling "worthless promotion stock owned by themselves,'' intending thereby to cheat and defraud complainants, and thereby they became "trustees *ex maleficio* of all the money thus paid for said worthless stock''; that in this stock-selling campaign, they represented that the new corporation would take over the assets, business and plant of the old company, which had quick assets amounting to $1,446,032, and was then earning over "eight times the dividend requirements" on the preferred stock of the new corporation; that Andrews & Company sent out telegrams offering stock for sale on the representation that the corporation was earning profits of a million dollars a year and that its estimated profits for the next year would be three and a half million dollars, and made other false representation in circular letters, written on the corporation's stationery, falsely representing the manufacturing property to belong to the corporation, whereas, in fact, the old company was conducting the manufacturing business and had possession of all the physical assets, and had in fact borrowed thereon nearly a million dollars, and secured the same by chattel mortgages on its plant and by pledges of its output; that in fact "the corporation"

was insolvent, and on October 5, 1917, a meeting of its creditors was called and a creditors' committee appointed; that it was then found that "the enterprise" owed more than its assets, and an agreement was made extending the claims of creditors, but that when such claims fell due there was no money to pay them and bankruptcy followed, on August 31, 1918; that it then appeared that instead of making any profits, as represented, there was in fact a deficit of over $350,000 for the thirteen months ending December 31, 1917.

The bill further charges that from time to time the directors met and expressly ratified all the previous acts of the board and of the executive committee, and voted large salaries to the president, chairman of the board, and general counsel; that in December, 1917, the members of the creditors' committee were formally elected directors, and so remained until the corporation was declared bankrupt; that it was their duty to know "and they *probably* did ascertain and know, all the facts attending said plan, scheme and device to cheat and defraud complainants," and it was their duty to disclose such facts and institute proceedings "on behalf of the corporation against the conspiring promoters, to compel them to turn in to the depleted treasury of the corporation the proceeds of the sale of said stock, less their reasonable commission," or, failing in that, to wind up the business of the corporation; but, instead, they chose to conceal the facts, and ratified the acts of the promoters, "and thus made themselves parties to the said conspiracy."

It is further alleged that complainants "had confidence in and relied upon    *    *    *    the statements and representations of defendants and the full disclosure of all material facts," and "reposed full confidence in defendants" as business men, prominent in the financial world, and "were slow to act and loath to believe that they had been deceived and duped, until an investigation, which was begun in their behalf soon after

notice of said bankruptcy proceedings was received,'' revealed that ''they had been made the victims of said fraudulent scheme and conspiracy,'' but that ''the full scope and import of said conspiracy, however, was not disclosed until November 15, 1919, when a copy of said preorganization agreement came into (their) possession,'' whereupon they notified defendants in writing of their election to rescind their subscription contracts and demanded the return of their money with interest, offering to return the certificates, etc.

It is also alleged that some of the complainants began a suit in the superior court for an accounting on February 26, 1919; and that another suit was brought in the United States District Court in December, 1919, both of which suits were dismissed. The bill in this case was filed February 29, 1924.

Three members of the creditors' committee, who were made defendants, were served. They were W. R. Dawes, D. R. Forgan and P. L. Coonley. They filed a joint and several demurrer to the bill as amended, alleging, with other grounds, that the bill was bad for multifariousness and misjoinder, and that the alleged cause of action against them was barred by the five-year statute of limitations. All of the other defendants who were served with process filed similar demurrers to the amended bill. These demurrers were sustained, and thereupon the bill was dismissed for want of equity.

In *First Nat. Bank of Lincoln v. Starkey,* 268 Ill. 22, 25, the court said, in substance, that to lay down any rule universally applicable as to multifariousness is, under the authorities, utterly impossible; that there is no inflexible rule, but the question is one which must be determined largely by the circumstances of each particular case; that under recent decisions, it is held that the objection of multifariousness raises merely a question of convenience in conducting the suit, that is, whether the court, in its discretion, will permit the

various causes set forth in the bill to be tried in a single suit, or divided and tried in two or more suits, or whether a defendant who is a necessary party in respect to some matters covered by the bill is so connected with the other matters involved as to make him a proper party in respect to them. In its opinion in that case, the court states several recognized principles and tests by which the defect of multifariousness may be discovered in any particular case. The first of such tests is that of "improperly joining in one bill distinct and independent matters and thereby confounding them." Another is whether the causes of action united in the bill require separate proofs, decrees or defenses. The opinion adds (p. 27): "But what is more familiarly understood by the term 'multifariousness' as applied to a bill, is where a party is able to say that he is brought as a defendant upon a record with a large portion of which he has no connection whatever. (1 Daniell's Ch. Pr.—6th Am. Ed.—*336.)"

In *King v. Rice,* 285 Ill. 123, 128, it is said: "Where the grounds of the suit against the defendants are different, each being sufficient in itself to sustain a bill and requiring different remedies, the bill will be deemed multifarious." It was upon this ground that the court, in *Golden v. Cervenka,* 278 Ill. 409, 437, held a bill to be multifarious which was brought by certain creditors, who sued in their own behalf and that of all other creditors similarly situated, against certain stockholders of an insolvent bank and also against a trust company which was sought to be charged with liability because of certain acts in connection with the organization of the insolvent bank. In that case, the joinder of all the creditors as complainants and all of the stockholders as defendants was held to be permissible, but that the alleged liability of the trust company was a distinct matter and made the bill multifarious.

In *Winsor v. Bailey,* 55 N. H. 218, the same principle

was applied.   There, a bill in equity, brought by part of the stockholders of a manufacturing corporation, charged that an illegal and fraudulent payment of dividends had been made to part only of the stockholders, and prayed that such stockholders be required to restore the same.   The bill also charged fraud and maladministration in office against the treasurer, and prayed for an injunction restraining him from further performing the duties of his office.   It was held that while the bill was not multifarious as to the cause of action alleged against the stockholders, it was open to the objection of multifariousness in joining with that cause of action, the alleged cause of action against the treasurer, saying (p. 222): "Several matters, distinct and unconnected, can not be joined in a bill against one defendant, nor, with still stronger reason, against several defendants when the various matters do not apply to some of them.   Story's Eq. Pl., sec. 275."

In the present case, the cause of action against the promoters is based upon the theory that the complainants have rescinded their several contracts for the purchase of stock because of alleged fraud and misrepresentation in the sale thereof, and are therefore entitled to a decree against those to whom it was paid, for the return of the purchase money.   The cause of action against the members of the creditors' committee is entirely different.   They are charged only with alleged neglect of duty in failing, after they had become directors (and thereby, presumably, had ascertained that such a fraud had been committed), to take immediate steps to wind up the affairs of the corporation, or to bring proceedings, on behalf of the corporation, against the promoters to compel them to turn into the corporate treasury the proceeds of the sale of such stock.   The former alleged cause of action is grounded upon the theory that complainants are no longer stockholders.   The latter cause of action is grounded upon

the theory that complainants still own the stock. The former cause of action is for money had and received, the latter for negligence.

It is charged in the bill, however, that the members of the creditors' committee became liable to the complainants individually and collectively because of the fact that after they were elected directors, they ratified and approved the acts of their predecessors on the board of directors. It is, we think, a sufficient answer to this contention to point out that the bill alleges that all but about 125 of the 1,612 complainants purchased their stock before the creditors' committee came into existence. As to more than nine-tenths of the complainants, therefore, the alleged fraudulent conspiracy on the part of the promoters was fully carried out without the aid or assistance, in any manner or form, of any member of the creditors' committee. The alleged ratification by the members of the creditors' committee, after they became directors, of the previous acts of their predecessors on the board, could not and did not make them parties to any conspiracy in which they had no part whatever, and did not alter or affect the position of such complainants in any respect whatever. As to those of the complainants who purchased their stock after the creditors' committee took charge, the averments of the bill clearly show that if they had any diligence whatever in buying their stock, they would have known that instead of making large profits the concern was insolvent, or bordering on insolvency, at that time.

We conclude, therefore, that the joinder of these causes of action in one bill makes the bill multifarious, and the demurrer upon that ground was properly sustained.

It has been held that the bar of the statute of limitations may be urged on demurrer where the bar appears on the face of the bill, unless an equitable excuse is alleged in the bill to avoid the bar. (*Bell v. Johnson,*

111 Ill. 374, 379; *Kerfoot v. Billings,* 160 Ill. 563, 572.) Here, the bill shows that the corporation was adjudged a bankrupt in August, 1918, more than five years before this bill was filed. Undoubtedly, the promoters of a corporation stand in a fiduciary relation to the future bona fide purchasers of stock from the treasury of a corporation, and when such promoters obtain a secret profit for themselves, they will be chargeable in equity therefor at the suit of the defrauded stockholders. (*Mason v. Carrothers,* 105 Me. 392; *Cox v. National Coal & Oil Inv. Co.,* 61 W. Va. 291; *Hayward v. Leeson,* 176 Mass. 310.) For that reason it is held that if such promoters fail to disclose to the subscribers of stock the true nature of the transaction, that fact may excuse the latter from the use of ordinary diligence to discover the fraud. (*Keithley v. Mutual Life Ins. Co. of New York,* 271 Ill. 584). But while this is true as to the promoters, and as to such directors, if any, as may have participated therein, it certainly cannot prevent the defendants, who were members of the creditors' committee and became connected with the corporation long after the fraud on the stockholders was committed, from claiming the bar of the statute or setting up laches on the part of the complainants. As to such defendants, we think the cause of action was barred by the statute of limitation, or by laches, and that as to them their demurrer was properly sustained upon that ground. This conclusion is an additional reason for holding that the bill is multifarious, for such defense, which is good as to some of the defendants, is not good as to others.

It does not appear from the record that complainants sought leave to dismiss their bill as to the members of the creditors' committee or to obtain leave to amend it, so as to make it not demurrable. For that reason, the decree dismissing the bill for want of equity necessarily followed.

In view of what we have said, it will be unnecessary

to consider the other propositions advanced. by complainants.

The decree is affirmed.

*Affirmed.*

BARNES, P. J., and GRIDLEY, J., concur.