WILLIAM R. HENDERSON, ALBERT R. BUDD, WALTER J. WILSON and FLOYD B. LOCKHARDT, and others, Intervenors,

*vs.*

PLYMOUTH OIL COMPANY, a corporation organized and existing under the laws of the State of Delaware, MICHAEL L. BENEDUM, SARAH N. BENEDUM, JOSEPH C. TREES, TREES DEVELOPMENT COMPANY, LIMITED, LEVI SMITH, JEROME G. FARQUHAR, WILLIAM E. HUSTON, EDWARD C. STEARNS, THOMAS R. COWELL, WALTER S. HALLANAN, FOSTER B. PARRIOTT, ADDISON F. HOLLIDAY, JR., CHARLES ADAMS, H. B. DAVENPORT, JOHN LAING, JOHN M. HOLLIDAY, RAY V. HENNEN, JOHN S. HANLON, ADDISON B. DALLY, JR., OVID D. ROBINSON, ELLSWORTH D. ROBINSON, J. L. KIRKLAND, H. D. MCCRACKEN, M. E. DAVIS, ARTHUR G. FLORES, D. A. MCCASKEY, C. H. HUSTON, ANNE A. ADAMS, THOMAS R. COWELL, BETTY COWELL and NILES W. BOTTOMFIELD.

*New Castle, Dec. 4, 1925.*

44

*Caleb S. Layton*, of the firm of Marvel, Marvel, Layton & Hughes, and with him *Owen J. Roberts*, of Philadelphia, Pa., and *Charles M. Thorp*, *W. D. Stewart* and *Earl F. Reed*, of Pittsburgh, Pa., for complainants.

*Herbert H. Ward*, of the firm of Ward, Gray, & Ward, and with him *John W. Davis*, of New York City, *John Charles Adams* and *John S. Weller*, both of Pittsburgh, Pa., and *H. D. Rummel* and *Fred O. Blue*, both of Charleston, W. Va., for defendants.

THE CHANCELLOR. The suit in this case though brought in the name of individual complainants is nevertheless a suit in behalf of the Plymouth Oil Company. The complainants sue in behalf of themselves as stockholders and all other stockholders who may choose to come in and become parties complainant. The corporation is made a party defendant. The fortieth paragraph of the bill excuses a demand upon the directors that they bring suit to correct the wrongs complained of on the ground that they are associated with said wrongs, participated in them and therefore cannot be expected to sue. The bill is, therefore, to be regarded as having been filed by the corporation defendant, whose rights are derivatively asserted by some of its stockholders, and the grievances, if any, are accordingly to be regarded as belonging to the corporation.

Briefly stated, the right to the relief asked for rests on the proposition that promoters of a corporation owe to it a fiduciary duty; that this duty antedates the formation of the corporation; that it is owed not alone to the corporation as its membership is composed at the time the transactions complained of were consummated, but as well as its membership is composed in the future if future stockholders are expected by the promoters to be invited to join it; that this duty, in that aspect of it which concerns us here, is to refrain from taking a profit at the expense of the corporation while it is in their control, unless the same is fully disclosed to all those who are members or who later become members upon the invitation of the promoters; and that if this duty is breached by either positive misrepresentation, or even negative concealment, the corporation may sue to recover from the wrongdoers the profits which they took.

The term "promoter" may be found variously defined. In *Old Dominion Copper Co. v. Bigelow*, 203 *Mass.* 159, 89 *N. E.* 192, 40 *L. R. A.* (*N. S.*) 314, it is defined as follows:

"In a comprehensive sense 'promoter' includes those who undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business. Their work may begin long before the organization of the corporation, in seeking the opening for a venture and projecting a plan for its development, and may continue after the incorpora-

tion by attracting the investment of capital in its securities and providing it with the commercial breath of life."

Let this definition of the word be accepted. The affidavits show that the status of Stearns in the affairs of this corporation was that of a promoter. Stearns, however, was not acting for himself alone. He was the outward representative of a group whose members are among the parties defendant. Whenever Stearns is mentioned, therefore, it is to be understood that his associates in the promotion are likewise meant to be named.

That Stearns was a promoter is taken as a present fact in the case. Another fact which must be accepted as true is, that when he made the sale to the Plymouth Oil Company of the $3,000,000 of Big Lake Oil Company's stock (together with certain other oil and gas properties) in consideration of all its capital stock, the Plymouth Oil Company was under his control and direction. All the then members of the corporation, and persons interested with him, were fully advised and informed, however, of the details concerning Stearns' acquisition of his rights and what he eventually received therefor. No complaint is made that he over-reached in any way his associates in the enterprise. The affidavits show also that, when the sale was made by Stearns and the stock issued to him as consideration therefor, it was the intention of Stearns to offer preferred stock for sale to persons outside his group. I shall assume that Stearns intended, not only at the time of the sale to the corporation, but also when he acquired his rights from Pickrell, to invite persons outside the circle of his associates to join the enterprise as stockholders of some kind. In the sequel, the outsiders turned out to be friends of the promoters who were taken in because the prospects for great gain were desired to be shared with these friends. The plan of the promoters does not appear to have had any of the earmarks of that type of stock-jobbing promotion which contemplates the throwing out of a drag net to catch as many victims from a gullible public as might be possible. If the view of the complainants is correct, however, the plan was in one sense even more vicious, in that it proposed to find its so-called dupes among friends of long standing. These friends became purchasers of preferred stock which had been issued as part consideration for property rights and turned back to a

trustee to be sold by him for the benefit of the company. What they bought, therefore, may be regarded as "treasury stock," though in point of form it stood in the name of a trustee.

When they purchased their preferred stock, the complainants say they were deceived by certain false statements concerning the capitalization of the company. This the defendants deny. I shall not now make a finding on this disputed question of fact. It does not appear to me to be necessary, because I understand the solicitors for the complainants to emphasize their view of this fact, not because it furnishes a ground upon which a case for relief may be predicated, but solely as evidentiary of the fact of secrecy which they contend vitiates the alleged profits which Stearns is charged with having taken. The main point in this connection is whether Stearns took a forbidden profit which was secret. It is not necessary, if the complainants are correct in their legal contentions, that the profit should be hidden by active misrepresentation; it is sufficient if it be hidden by mere failure to disclose it. And inasmuch as I shall assume that the profit, if any, which went to Stearns was not fully disclosed to all the purchasers of preferred stock, the element of secrecy within the meaning of the complainants' contention is made out without reference to the question of whether there was a positive misstatement concerning the company's capitalization. There remains, of course, the principal question to be discussed of whether Stearns did as a fact receive anything which may, under the principles of law applicable to this subject, be properly designated as a forbidden profit, even though it was not disclosed. More upon this question will be said later. All I am concerned with at this point is to explain why no further mention will be made touching the disputed fact with respect to the representations alleged to have been made concerning the company's capital structure.

The defendants contend that even if the proposition of law upon which the complainants, as above stated, base their right to relief be conceded, yet it cannot avail them here because of the fact that the stock which they purchased was "treasury stock" which had once been lawfully issued. The point they urge is that whatever right the corporation may have to recover forbidden profits from promoters by reason of the subsequent inclusion of inno-

cent stockholders in its membership, yet its name cannot be used as sponsor for a suit to recover such profits by a subsequent stockholder who acquired his stock, not from the corporation as part of its original issue, but from the alleged wrongdoer or his successor in title. The principle of law which they rely upon in this connection is, that inasmuch as the present holder of the stock acquired it from one who himself could make no complaint either in his own name or in that of the corporation against the wrong claimed to have been done by himself, any subsequent holder who derived title from him took the stock *cum onere* and is as equally burdened with incapacity to complain as is the original holder. That this is the law is generally true. It is so laid down in the *Old Dominion Copper Co. Cases* both in the Supreme Judicial Court of Massachusetts and in the Supreme Court of the United States. *Old Dominion Copper Co. v. Bigelow*, 203 *Mass*. 159, 89 *N. E*. 193, 40 *L. R. A. (N. S.)* 314; *Old Dominion Copper Co. v. Lewisohn*, 210 *U. S.* 206, 28 *S. Ct*. 634, 52 *L. Ed*. 1025. These two cases involved the same transaction and though they reach results which are in opposition, yet upon the point now under consideration they agree. The principle referred to and the considerations which underlie it are thus stated by *Ehrich* in his work on the *Law of Promoters, at par*. 120:

"It is now established by an almost unbroken line of decisions, that if the promoters themselves take the entire share capital of the corporation and then sell the shares to outside parties, there is no fraud upon the corporation, and no basis of complaint by it, no matter what profits the promoters may derive from the transaction. There is, it is said, no fraud upon the corporation, nor upon any one, in the original transaction for there is in effect a mere change of form, the promoters receiving the share certificates in the place of the property transferred to the corporation, and the value of the property transferred to the company is the exact measure of the value of the shares received in payment therefor. The par value of the shares issued in payment may greatly exceed the value of the property transferred to the corporation, but the amount which the property transferred falls short of the par value of the shares will be exactly represented by the difference between the par and the actual value of the stock.

"If there is any fraud in a subsequent sale of the shares the cause of action arising therefrom is personal to the purchasers. The matter is one between these purchasers and their vendor, and no cause of action results to the corporation therefrom."

This being the law, it is decisive of the present rule unless there is merit in the contention made by the complainants by which they seek to except the present case from its application. They say that the principle referred to is not applicable when, as here, the promoters take down their secret sale profit in the form of stock and intend at the time to hand back to the corporation some of the stock so acquired to be sold by it to the innocent public, from whom the cash is to be obtained to set the corporation going. In other words, they argue that if it is the purpose of the profit takers to have the corporation go through the form of placing its stock in the hands of the public via. the promoters instead of selling it directly from its unissued shares, then the law, looking at the substance and not at the form of things, will regard the transaction as though the purchasing stockholder, even though he acquired his stock through the promoter, nevertheless in fact acquired it from the corporation as a part of its original issue. It is to be observed, however, that even in the *Bigelow Case* in Massachusetts, supra, which is so strongly relied upon by the complainants, though the court expressly found that there was a secret promotion profit obtained through an over-valuation of property sold by the promoters to the corporation, yet the right of the corporation to sue was studiously predicated throughout the opinion upon the fact that the subsequent stockholders, who were contemplated by the promoters to be brought in for the purpose of supplying the cash for working capital, were purchasers of original stock. Their status as purchasers of such stock was so clearly emphasized that the conclusion is inescapable that the court, if their status had been that of purchasers of so-called "treasury stock"— stock that had been issued to the promoters upon an over-valuation of property and turned back for sale—would have held that the corporation could assert no grievance. Another case strongly relied upon by the complainants is that of *Mason v. Carrothers*, 105 *Me*. 399, 74 *A*. 1033. In that case there appears this language:

"It would be correct [the contention that no actionable wrong had occurred] as to subsequent stockholders who might purchase from the promoters or from Irvine and Lihou [their associates] stock already issued, but it is not correct as to those who might without notice purchase directly from the treasury, because it ignores the fiduciary relation between promoters and such fu ture purchasers."

The complainants cite authorities which they contend are to the contrary of this. Granting them to be in conflict with this as is contended by the complainants, yet upon reflection they do not appear to be applicable to such facts as we find here. The point of distinction which differentiates them from this case hinges upon the question of whether full value was given by the promoters for the stock received by them. Let us assume at this place that the promoters gave full value for the stock they received (whether they did will be discussed later).

On this assumption, which later on is accepted as sound, the complainants' authorities will be found on examination to be irrelevant to the discussion. The authorities are *Yale Gas Stove Co. v. Wilcox*, 64 *Conn.* 101, 29 *A.* 303, 25 *L. R. A.* 90, 42 *Am. St. Rep.* 159; *American Forging, etc., Co. v. Wiley*, 206 *Mich.* 664, 173 *N. W.* 515; *Pittsburg Mining Co. v. Spooner*, 74 *Wis.* 307, 42 *N. W.* 259, 17 *Am. St. Rep.* 149; *Anderson v. Johnson*, 45 *R. I.* 17, 119 *A.* 642; *Macey Co. v. Macey*, 143 *Mich.* 138, 106 *N. W.* 722, 5 *L. R. A.* (*N. S.*) 1036; *California-Calaveras Mining Co. v. Walls*, 170 *Cal.* 285, 149 *P.* 595; *Beal v. Smith*, 46 *Cal. App.* 271, 189 *P.* 341. These cases are distinguishable from the instant one, if not upon the point of full value for the stock, then upon other grounds. The *Yale Gas Stove Case* discloses an issuance of stock at an over-valuation (a circumstance of moment as hereinafter pointed out); and furthermore the subscribers to stock became such before the company was formed (another important distinguishing feature which ought not to be lost sight of when cases dealing with a promoter's transaction with his company are studied for their principles). *American Forging, etc., Co. v. Wiley*, in Michigan, was a case where the action was to secure relief against a breach of contract made by a promoter with his associates on behalf of the company, an action entirely different from what we are here dealing with. In *Pittsburg Mining Co. v. Spooner*, there was a clear case of over-valuation and the promoters did not own the option which the corporation exercised and in doing so directed its stock to be issued as a consideration. The court refused (an important point to note, when the facts of the instant case are considered) to say what would have been the result if the promoters had owned the mining option and had formed the corporation and issued full

paid stock to themselves in payment for such option, and then by exaggerated or false statement as to its value, or as to its actual cost, had induced others to purchase from them such stock; or whether in such case any action for fraud could be maintained by the corporation. *Anderson v. Johnson*, in Rhode Island, turns on the fact that the stock was issued for property of no substantive value. In *Macey Co. v. Macey*, the situation was very much like that in the *Yale Gas Stove Case, supra,* in that there were subscribers to the stock before the corporation was formed, and also in that the issuance to the promoters was for a worthless consideration. In *Beal v. Smith*, the fraud, says the court, consisted mainly in the fact that the securities were issued in exchange for dummy and worthless stocks. And in the case of *California-Calaveras Mining Co. v. Walls*, there was not only an over-valuation of the property exchanged for stock, but in addition there was a fraud perpetrated by the defendant promoter upon his associates, all of whom the court said were to be regarded as subscribers and stockholders.

In all of the cases referred to the circumstance that so-called "treasury stock" was acquired by the complaining stockholders appears to have been present. In only a few of them is this circumstance noted and commented on by the court. When it is commented on it is said in substance that the receipt of the stock by the promoters and the subsequent transfer back to the corporation is mere jugglery and will not be allowed to give to the stock a complexion other than that of stock originally issued to the purchasing public. But in such cases, it is to be noted, the stock was issued at an over-valuation. Where such is the case, there may be room to contend that the stock was never lawfully issued by the corporation, and therefore its temporary presence in the hands of the promoters is to be completely ignored. Especially is this so where statutory provisions require that stock shall be issued only for full value in money, property or services. This court in *Ellis v. Penn Beef Co.*, 9 *Del. Ch.* 213, 80 *A.* 666, has denounced an issuance of stock of a Delaware corporation without consideration as a "fraud towards the State, which in effect has prohibited such transactions." Cases elsewhere may be found to the same effect.

Even though it should be granted that stock issued to promoters without value received and turned back by them as treasury stock to the corporation, by which it is afterwards sold, is unincumbered by any estoppel arising out of its having been formerly held by the promoters so that the present holder is free to assert complaints which his predecessor in title could not assert, I am of opinion that if promoters give full value for the stock they receive, they may turn it back to the treasury to be sold for the benefit of the corporation, and purchasers thereof have no better right than the original promoter to complain in the name of the corporation against any supposed wrongs that may have attended its issuance. All that the corporation can demand for its stock having a par is the value thereof. If it gets that, how can it be injured? If the stock was lawfully issued, giving it back to the treasury to be turned into money is no different in reason from what would take place if the first recipient had himself sold it and donated to the treasury the cash proceeds. In either case the result so far as the corporation is concerned is the same. In both cases it winds up with money in place of its stock, and in both cases its stock stands out against full value paid. The stock of this corporation having been issued for full value, I do not regard the cases referred to by the complainants as authorities in favor of the proposition that the stock which they bought is to be regarded as original stock which has simply been juggled with by Stearns in the vain hope of giving it a different status. If this be so, then under the *Bigelow Case*, which is so firmly relied upon by the complainants, the complainants have the status of Stearns and are as effectively foreclosed from complaint in the corporate name as he would be. What would be the situation if Stearns had not given full value for his stock, the facts as presented by the affidavits do not call upon me to answer.

I now turn to the important question of fact, viz., was the property which Stearns sold to the corporation fairly worth $5,250,-000, the par value of the stock which he received for it? The *Constitution* of this State in the third section of its *Ninth Article* provides that:

"*Section 3.* No corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation."

*Section* 14 of the General Corporation Law (*Section* 1928 of the *Revised Code* of 1915), provides as follows:

"*Sec.* 14. ISSUANCE OF STOCK FOR LABOR OR REAL OR PERSONAL PROPERTY.—Subscriptions to, or purchase of, the capital stock of any corporation organized or to be organized under any law of this State may be paid for, wholly or partly, by cash, by labor done, by personal property or by real property or leases thereof; and the stock so issued shall be declared and taken to be full paid stock and not liable to any further call, nor shall the holder thereof be liable for any further payments under the provisions of this chapter. And in the absence of actual fraud in the transaction, the judgment of the directors, as to the value of such labor, property, real estate or leases, shall be conclusive."

Actual fraud in the valuation of the assets to be acquired is thus necessary to be made out in order for the judgment of the directors to be overthrown. Under the facts of this case, I have not the slightest hesitance in finding that the judgment of the directors who valued the property at the figure of $5,250,000 was not only free of actual fraud, but was conspicuously fair. The resolution of valuation was adopted after a very careful and thorough investigation by skilled and competent men extending over a period of several weeks. They valued Stearns' rights at from $16,-000,000 to $25,000,000. Of course the thing was which being valued was oil lands. These are notoriously uncertain in their possibilities. But it would be unreasonable to say that the particular properties in question were of the "wildcat" variety. A proven well had been drilled and it flowed over a period of several months with a persistency which was especially marked in view of the adverse conditions surrounding it. Extensive studies of the geological formations in its vicinity were made, and the result of those studies was such that men, such as were these men in the Stearns group, whose life work equipped them to appraise with greater intelligence than most men the oil values of a given field, were convinced that a great discovery had been made. The sequel has justified their judgment. It appears now that the properties owned by Stearns and acquired by the defendant corporation are worth in the neighborhood of $40,000,000. No one disputes this. The contention that traders in oil lands would not have given $5,250,000 for the Stearns rights at the time of their acquisition by the Plymouth Oil Company does not present itself with appealing force. What is of

moment is that there was just as much oil in the ground when only one well was tapping its reservoirs as subsequent drillings have revealed. Stearns and his associates had the acumen to visualize it in great measure and to appraise it accordingly. It is impossible to conclude that, in the intelligent judgment they formed, fraud of any kind characterized their act.

But, it is said, Stearns had no property rights; he had at best only a bare option to purchase, which option he induced the corporation he organized to exercise and pay the money called for thereby out of funds supplied by the purchasers of preferred stock, who were ignorant of the large amount of common stock which he and his associates had taken for themselves. This being the situation, say the complainants, it is a case where promoters induced others to put up all the money for a venture in which, if there was failure, the outsiders would be the only losers, and if there was success the promoters would reap the lion's share of the profits. In part, at least, this is plausible. But I see nothing fraudulent in it. In the first place, Stearns did not have a mere option. He had certain definite, fixed and firm contract rights. His agreement bound Pickrell to convey and Stearns to pay. While Stearns was bound to consent to a transfer of the lease and permits to a corporation (Big Lake Oil Company) and was not forbidden to sell the three-fourths of this corporation's stock to another corporation if he saw fit (which he did, the defendant corporation being the other one), yet he himself always remained under the personal obligation to Pickrell to pay the cash of $200,000 and advance the money for completing two wells and drilling four other wells which was estimated to cost $250,000. Some of his associates guaranteed the faithful performance of his obligations and thus assumed with him their burden, without which Pickrell would have rejected the contract. Stearns was bound by his contract regardless of whether or not he ever formed the defendant corporation, or any other one, for a like purpose. He was under no obligation to form any corporation to purchase his three-fourths of the Big Lake stock. He and his associates might have brought their organization plan to a terminus at that stage of it where the Big Lake was to take over the property. If they had, Stearns would still be bound to supply the necessary funds from some source to

carry out his obligations to Pickrell. He thus had firm rights and was under correlative obligations. There was nothing in the nature of an option about it. So that we have the situation thus far of Stearns possessing certain definite rights which would eventually place him in the ownership of three-fourths of the stock of a corporation known as Big Lake Oil Company. The defendant corporation was not in existence when the contract giving him these rights was executed. What he owned was his, and he could do with it as he pleased. It cannot be said that when he acquired his rights from Pickrell he was under any duty to the Plymouth Oil Company, which was not yet in existence. In this particular the case is similar in principle to the *Old Dominion Copper Co. Cases* in Massachusetts and in the Supreme Court of the United States, in both of which, though they disagree in results, there is no diversity on this point, viz., that at the time of the purchase by the promoters there was no fiduciary duty owed to the future corporation. Other cases are to the same effect, notably the English cases of *New Sombrero Phosphate Co. v. Erlanger*, 5 *Ch. Div.* 73, and the same case on appeal in 3 *App. Cas.* 1218; and *Ladywell Mining Co. v. Brookes*, 35 *Ch. Div.* 400. Those cases, therefore, in which it is found as a fact that the promoter had a mere option which he had secured on behalf of a corporation either in existence or proposed to be created and which option the corporation in due time exercised with its own funds, are clearly distinguishable from this one, for in those cases there may be some ground in reason for saying that if the promoter received a profit he did so only at the expense of an agency which had fortuitously placed him at an advantage between his corporation on the one side and its vendor on the other. The distinction between cases where a mere option is involved and those where the promoter-vendor is the owner not alone of a legal title, but as well of what I may call firm rights, is noted by Mr. Justice Pitney in the case of *Woodbury Heights Land Co. v. Loudenslager*, decided by him when he was a Vice-Chancellor of New Jersey and reported in 55 *N. J. Eq.* 78, 35 *A.* 436. He says:

"This characteristic, namely, that neither Roe nor the defendant [the promoter] was the owner of these lands at the date of this transaction, distinguishes this case from a line of authorities which hold that a party, being already the actual or potential owner of property, either having the legal title

vested in him or by holding it under contract with part of the consideration paid and mutual obligations to pay the balance of the consideration and to convey the property, may innocently promote and organize a company to buy it at an advance."

In reply to this contention of the complainants that Stearns had but an option, it is not necessary to decide whether in all cases without exception if the promoter be a mere optionee he can make no profit. It is sufficient merely to observe that whatever the correct rule might be with respect to such cases, we are not concerned with it here, because Stearns was not an optionee; he was the owner of rights which were rigidly and firmly fixed by a contract of purchase and sale. It is to be observed also that what Stearns sold to the defendant was not his rights under the Pickrell contract. He sold shares of stock of the Big Lake Oil Company—$3,000,-000 worth in par value. To be sure, the Plymouth Oil Company agreed to meet Stearns' obligation to make the cash payments amounting to at least $450,000. Of this sum $200,000 was already taken care of by a $50,000 cash payment and $150,000 in notes made by Stearns and associates. The cash payment immediately, I suppose, and the payment of the notes eventually came from moneys received from the sale of the 150,000 shares of preferred stock. The complainants, therefore, and others similarly situated, supplied it. It is because of this situation that the complainants say that they furnished the money and took the risk, while the defendants took only the prospect of gain. This is not entirely correct, however, for the affidavits show that the Stearns group advanced altogether at one time or another, either in the form of cash or endorsement, something over $600,000. It cannot be said therefore, that the complainants and others similarly situated took all the risk and the promoters none. But considerations of this nature having to do only with the relative risks assumed are not such as to be of moment in determining the merits of the controversy here involved. If the true situation was that the so-called promoters had a highly valuable asset honestly believed, and subsequently demonstrated, to be capable of yielding great gains, I know of no principle of equity which would require the owners of these assets to allow others to share in equal ratio all of the profits if they were admitted to share any.

It is said also that the stock issued to Stearns was issued without consideration because it was but a mere capitalization of prospective profits, and *Wallace v. Weinstein*, 257 *F*. 625, 168 *C. C. A.* 575, is cited in support of the proposition that under the Delaware law such profits cannot constitute a lawful consideration for stock. In the cited case, the stock was issued for certain contracts of agency with automobile manufacturers, and their value, if any, was due solely to the possible profits which might be made by any one operating under them. The contracts, which turned out to be worthless, if property in any sense, said the court, contained nothing but a promise of profits. The case is clearly distinguishable from the one we are now dealing with. Here there was no issuance of stock in consideration for anything analogous to a contract giving a right to sell automobiles. What supplied the consideration here was a block of $3,000,000 worth of stock in the Big Lake Oil Company. And even if we look beyond the stock of the Big Lake Oil Company to the consideration underlying it, we in turn find nothing in any sense similar to such contracts as *Wallace v. Weinstein* deals with. We find tangible assets in the form of an interest in oil and gas lands. It is quite true that such lands acquire their value solely from what profits may be made out of their management and operation. But so also is value obtained by property of any description. If lands contain oil and gas beneath their surface, the value of the lands is based on what profit can be made from their exploitation in the same sense and no other that the value of a cultivable field is based on its capacity to yield profit to the tiller of its surface soil. In both cases profits constitute an all important element in the item of value. But in the one case as well as in the other there is a present, existing, tangible property. The case of *Wallace v. Weinstein* does not hold that property of this kind is not a sufficient consideration for the issuance of stock of a Delaware corporation. Nor does either of the two authorities cited by *Wallace v. Weinstein* in support of its ruling so hold.

For the reasons above given it therefore appears that the complainants and all interveners with them as holders of preferred stock are in the situation of those who hold stock which was lawfully issued to the promoters and are as effectively precluded from

any complaint, if there be a ground for any, as the promoters would be from whom they derive their title. This in itself constitutes a sufficient ground for a discharge of the present rule. The feature of the promotion stock as issued for lawful value which strips it of all semblance of being in reality stock of original issue, while serving thus to foreclose the complainants from complaining, at the same time serves also in another aspect of the case in a yet more emphatic way to render it highly inequitable to grant the relief of cancellation which the bill seeks. This aspect of the matter will, however, be reserved for final discussion.

Before proceeding to such final discussion, it may be well to pause here for the purpose of pointing out the distinguishing features which serve to render inapplicable to the facts here presented many of the authorities cited by the complainants. A great number of such authorities is cited, and all of them have been examined. To refer to them all in a detailed discussion of each would prolong this opinion to an inordinate length. Those cases are cited to support the complainants' principal proposition, viz., that promoters are liable to account for secret profits to the corporation where as an original scheme the public is intended to be drawn into the corporation and to provide funds for its continuance, and that the only way in which the promoters can be relieved from this liability is for them to provide an independent board of directors to whom full disclosure is made, or to make a full disclosure of all material facts to each subscriber for original shares, or to procure a ratification of the transaction after disclosing all its attending circumstances by vote of the stockholders of the completely organized corporation, or, finally, to themselves become the real subscribers to all the stock contemplated as a part of the original promotion scheme. This is the proposition for which the case of *Old Dominion Copper Co. v. Bigelow*, 188 *Mass.* 315, 74 *N. E.* 653, 108 *Am. St. Rep.* 479; 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314, stands. On the same state of facts the Supreme Court of the United States has taken the diametrically opposite position. *Old Dominion Copper Co. v. Lewisohn*, 210 *U. S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1025.

The instant case is so clearly distinguishable from the *Old Dominion Coprer Cases* in certain very material features that its

decision does not necessitate a choice between the irreconcilable views of the two eminent tribunals which passed upon the Old Dominion Copper Company transaction. This court. in *Ellis v. Penn Beef Co.*, *supra*, has taken occasion to prefer the doctrine of the Massachusetts court to that of the Supreme Court of the United States as founded upon the sounder and better reason. It is to be noted, however, that the *Penn Beef Case*, in which Chancellor Curtis thus expressed himself as favorable to the doctrine of the *Bigelow Case* as opposed to that of the *Lewisohn Case*, was decided in the light of the special constitutional and statutory provisions found in our law, by which the issuance of stock without value paid therefor is denounced by him as a fraud, not upon stockholders, but upon the State. If this view be accepted, whether rightly or wrongly, it is apparent that consideration of the equities as between stockholders upon which the grievances assertable by the corporation are made to turn, a consideration to which the *Bigelow* and *Lewisohn Cases*, as well as many others, direct themselves, can be of no pertinency. I therefore regard the remarks of Chancellor Curtis concerning these two cases as partaking of the nature of *dicta*. A very illuminating discussion of the doctrine of the *Bigelow Case* in Massachusetts may be found in the *Harvard Law Review*, *vol.* 30, *No.* 1. The writer of this article advances some very cogent reasons against its acceptance. Inasmuch, as I have before stated, that the instant case presents an entirely different state of facts from that found in the Old Dominion Copper Company litigation, anything that I might say by way of approval or disapproval of either the Massachusetts doctrine, or the Supreme Court doctrine, would be mere *dictum* and so will be left unsaid. As I have before endeavored to show, the case now before the court is distinguishable from the *Old Dominion Copper Co. Cases* first in respect to the non-original character of the shares held by the complainants; and, second, in the circumstance that the property which the promoters turned over in this case in exchange for the stock was not only of equal, but of even greater value than the par of the stock received.

Continuing with the purpose expressed a moment ago to point out wherein this case is distinguishable from those cited by the complainants in support of their principal proposition, it is

to be first stated that notwithstanding there may appear language in those cases which, if detached from the circumstances to which it is variously addressed, may give countenance to the complainants' contention here, such language is nevertheless to be laid aside as not pertinent because of divergence upon critical facts. This is not a case where it is sought to assess shares of stock for the benefit of creditors, as were *See v. Heppenheimer*, 69 *N. J. Eq.* 36, 61 *A.* 843, and *Holcombe v. Trenton, etc., Co.*, 80 *N. J. Eq.* 122, 82 *A.* 618. Nor is it a case in which the complainants seek to compel the corporation to pay for services rendered in selling its stock, promised by a promoter. *Cushion Heel Shoe Co. v. Hartt*, 181 *Ind.* 167, 103 *N. E.* 1063, 50 *L. R. A.* (*N.S.*) 979. Neither is it a case where relief is sought to cancel the complainants' stock and to secure a return of the money paid therefor on the ground that its purchase was induced by fraudulent representation. *Hinkley v. Sac Oil & Pipe Line Co.*, 132 *Iowa*, 396, 107 *N. W.* 629, 119 *Am. St. Rep.* 564. If there are existing stockholders at the time the promoters deal with the corporation, and the transaction is such as to give to the promoters a secret profit, the corporation at that time being in their control, it is manifest that an entirely different case is presented from that which we have before us. Such was the situation in the following cases: *Yeiser v. U. S. Board & Paper Co.*, 107 *F.* 340, 46 *C. C. A.* 567, 52 *L. R. A.* 724; *Woodbury Heights Land Co. v. Loudenslager*, 55 *N. J. Eq.* 78, 35 *A.* 436; *Plaquemines Tropical Fruit Co. v. Buck*, 52 *N. J. Eq.* 219, 27 *A.* 1094; *South Joplin Land Co. v. Case*, 104 *Mo.* 572, 16 *S. W.* 390. The Court of Chancery of New Jersey in *Arnold v. Searing*, 73 *N. J. Eq.* 262, 67 *A.* 831; *Id.*, 78 *N. J. Eq.* 146, 78 *A.* 762, has held that co-members of a syndicate to acquire property of an existing corporation via. merger proceedings with a new corporation to be organized by promoters as agents of the syndicate, while not technically stockholders yet equitably are such, and that the promoters cannot take a profit out of the corporation while under their control at the expense of the existing innocent "equitable stockholders" who are ignorant of the fact. *Davis v. Las Ovas Co.*, 227 *U. S.* 80, 33 *S. Ct.* 197, 57 *L. Ed.* 426, and *California-Calaveras Mining Co. v. Walls, supra*, are similar in principle. In such cases the co-associates of the promoter are held to be nothing more than sub-

scribers to stock. Subscribers to stock are expressly recognized to be "equitable stockholders" by Judge Rellstab in *Tilden v. Barber*, (*D. C.*) 268 *F.* 587. The same principles of law which exist for the protection of existing stockholders of record against secret dealings with the corporation, to the profit of those who control it, are extended by this class of cases for the protection of subscribers to stock who though not yet technically members of the corporation are nevertheless regarded as equitably so. In other words, these cases hold that the corporation may assert a grievance which such equitable stockholders have never assented to as fully as it might if such stockholders were of record at the time the wrongs were done. In the instant case at the time of Stearns' dealings with the defendant corporation there were neither existing innocent stockholders of record nor any equitable stockholders in the form of subscribers to stock. (Unless Davenport and Laing were then subscribers, about which the record is not clear. But they are not complaining, and seem to have been fully advised.) This being so, not only the cases just referred to, but as well the following cited by the complainants are distinguishable from the instant one: *Nickel Plate Land Co. v. Broom*, 96 *W. Va.* 586, 123 *S. E.* 594; *Rice's Appeal*, 79 *Pa.* 168; *Richlands Oil Co. v. Morriss*, 108 *Va.* 288, 61 *S. E.* 762; *Yale Gas Stove Co. v. Wilcox*, 64 *Conn.* 101, 29 *A.* 303, 25 *L. R. A.* 90, 42 *Am. St. Rep.* 159; *Macey Co. v. Macey*, 143 *Mich.* 138, 106 *N. W.* 722, 5 *L. R. A.* (*N. S.*) 1036; *Pittsburg Mining Co. v. Spooner*, 74 *Wis.* 307, 42 *N. W.* 259, 17 *Am. St. Rep.* 149. Nor is this a case where the profit was taken by one held to stand in the position of an agent for the corporation as principal. Such appears to have been the situation in *Wills v. Nehalem Coal Co.*, 52 *Or.* 70, 96 *P.* 529. In addition to the other differentiating circumstances pointed out above, such also was the situation in the cases above referred to of *Yeiser v. U. S. Board & Paper Co.*, *Woodbury Heights Land Co. v. Loudenslager*, *Plaquemines Tropical Fruit Co. v. Buck*, and *South Joplin Land Co. v. Case*. This also is not a case where the profit was secured by means of false inducing representations touching the value of the property purchased, or what was necessary to be paid for it, as appears to have been the fact in the following cases: *Nickel Plate Land Co. v. Broom*, *supra* (distinguishable, as before stated, also on other

grounds); *Pittsburg Mining Co. v. Spooner, et al.*, 74 *Wis.* 307, 42 *N. W.* 259, 17 *Am. St. Rep.* 149; *Simons v. Vulcan Oil Co.*, 61 *Pa.* 202, 100 *Am. Dec.* 628; *South Joplin Land Co. v. Case, supra* (distinguishable also on the ground before noted). There were not only the features present which have been before noted in the cases of *Nickel Plate Land Co. v. Broom, Pittsburg Mining Co. v. Spooner*, and *Woodbury Heights Land Co. v. Loudenslager*, but this additional feature also which is not present here, namely, that the defendants obtained their profit by interposing their hands between the corporation and an optionor in such way as to take a clandestine profit out of the purchase which was being made by the corporation in exercising the option to buy. The present case is also clearly distinguishable in point of applicable principle from the case of *American Forging Co. v. Wiley*, 206 *Mich.* 664, 173 *N. W.* 515, where the action was based on a breach of trust by a promoter who held stock to be sold by him for the benefit of a corporation and who claimed title to it as his own. With respect to the case of *Mason v. Carrothers*, 105 *Me.* 392, 74 *A.* 1030, relied upon by the complainants, this, in addition to the fact of overvaluation, is to be observed, viz., that the court regarded the action as one asserted by the complainant in his individual capacity for redress of individual and not corporate grievances, a circumstance which, so far as my study of the authorities discloses, is of prime importance in the determination of the controlling principles. In many of the cases referred to, as well as in *Pietsch v. Milbrath*, 123 *Wis.* 647, 101 *N. W.* 388, 102 *N. W.* 342, 68 *L. R. A.* 945, 107 *Am. St. Rep.* 1017, and the *Old Dominion Copper Co. Cases*, the corporation was the complainant, either in form or in fact, to redress wrongs which were conceived to have been done to it because its membership included purchasers of stock of original issue, a feature which I have already adverted to as of importance in differentiating the instant case. And in nearly all of them there was an issuance of stock at an over-valuation of property, as in *Ellis v. Penn Beef Co., supra*, in Delaware, and the following cases not before cited: *Bennett v. Havelock Electric Light, etc., Co.*, 21 *Ont. L. R.* 120, 18 *Ann. Cas.* 354, and *Beal v. Smith*, 46 *Cal. App.* 271, 189 *P.* 341. The principle of the case of *Bennett v. Haverlock Electric Light, etc., Co.*, in Ontario, is difficult for me to under-

stand, for the reason that while the opinion announces views which are in harmony with the complainants' contention here (except that there appear to have been innocent purchasers of stock of original issue, a circumstance which as before observed is of interpretative force in reading the language of the opinions in such cases), the court allowed that portion of the stock which represented the secret profit obtained on an over-valuation of property to remain in the hands of that one of the promoters who owned the property and canceled the balance which was in the hands of his four associates and which came to them by transfer from him. The principle on which this distinction rests is difficult to understand, unless it be that the court considered that the owner of the property was entitled to reap as much profit as he chose provided he kept it all for himself, but that others with whom he shared it should be compelled to give it up. The case is apparently so contradictory in its judgment to the language of the opinion that the principle actually meant to be stated by the opinion is difficult to extract. If the rule which looks to the judgment for the decisional value of a case is accepted, then there is nothing in the Ontario case hostile to the defendants here.

In the foregoing review of authorities cited by the complainants, no mention has been made of several English cases to which reference has been made on their briefs. These cases as I have read them do not appear to me to be adverse to the conclusion which is reached in this one. None of them presents a situation such as I shall in a moment briefly describe as the situation here, and they all, I think, fall within one or more of the distinguishing categories of the cases which I have above attempted to enumerate. But aside from this, I confess myself somewhat hesitant, as Chief Justice Knowlton apparently was in his dissent in the *Bigelow Case* in Massachusetts, 203 Mass. 159, at page 231, 89 *N. E.* 193, 220 (40 *L. R. A.* [*N. S.*] 314), to accept in full the expressions of English judges in cases of this character in this State, where we have no such provision in our law as is found in *Section* 38 of the *English Companies Act* relating to the duty of issuing a prospectus when shares are contemplated to be sold. That section is as follows:

"Every prospectus of a company, and every notice inviting persons to subscribe for shares in any joint-stock company, shall specify the dates and

the names of the parties to any contract entered into by the company, or the promoters, directors, or trustees thereof, before the issue of such prospectus or notice, whether subject to adoption by the directors of the company, or otherwise; and any prospectus or notice not specifying the same shall be deemed fraudulent on the part of the promoters, directors, and officers of the company knowingly issuing the same, as regards any person taking shares in the company on the faith of such prospectus, unless he shall have had notice of such contract." *Section* 38 *of the Companies Act,* 1867 (see 1 *Cook on Corporations,* [8th Ed.] § 143, p. 503).

As showing the importance in the English law of this provision upon a very crucial point in cases of this character, the language of the Master of the Rolls in *Lagunas Nitrate Co. v. Lagunas Syndicate,* (1899) 2 *Ch.* 392, is of significance. He says at page 428 of the report:

"The Nitrate Company, although in one sense formed when registered, was not completely formed, as contemplated by the promoters, until a prospectus had been issued and a large capital had been subscribed."

Where a prospectus is intended to be issued, it thus appears that under the English law there is a statutory duty of full disclosure upon points materially involved in the instant case. And furthermore, if no prospectus is intended to be issued, that is to say in all other cases, there is a statutòry duty of a similar kind provided by the English law to be performed by the filing of certain information of a similar detailed nature with the registrar. See the summary of the English statute taken from *Halsbery's Laws of England, vol.* 5, *pp.* 141, 142, and given by Cook in a note on page 285 of the first volume of the eighth edition of his "*Treatise on the Law of Corporations.*"

In the light of these peculiar statutory provisions applicable to corporations formed under the *English Companies Act,* cases decided by the English courts touching questions of the nature we are here concerned with are of doubtful value as authorities.

In some of the American cases above referred to, the *Old Dominion Copper Co. Cases* with their conflicting decisions in Massachusetts and the United States Supreme Court are referred to and the doctrine of the *Bigelow Case,* which the complainants appeal to here, is stated to be preferred as against the contrary doctrine announced upon the same state of facts by the Supreme Court of the United States. On the other hand, other cases are

cited by the defendants in which courts in other jurisdictions have expressed approval of the doctrine of the Supreme Court in preference to that of the Supreme Judicial Court of Massachusetts. I shall not lengthen this opinion by reference to the cases thus cited by the defendants. It would serve no useful purpose to do so. All that I wish to observe is that with respect to some of them the facts are such as appear to me to render their approving language as much *dicta* as is the disapproving language in some of the cases cited by the complainants. The adverse result which is visited upon the complainants in disposing of the present rule has prompted me to pay detailed attention to the authorities cited by the complainants to the neglect of those cited by the defendants for the purpose of disclosing the reasons which in the light of my judgment appeal to me as not warranting their acceptance as persuasive in a case such as the affidavits here present. The defendants have an ample defense otherwise which makes it unnecessary to lengthen this opinion by a discussion of the authorities cited by them in this connection in opposition to those cited by the complainants to which for the reason just given some attention has been paid.

Having paused to point out the distinguishing features inherent in the cases cited by the complainants, I now proceed to a discussion of that feature of the case which was deferred awhile ago for final attention.

This feature has to do with what seems plainly to be the inequity of the relief asked. Here is a case where, as already shown, the defendant promotors gave more than full value for the stock they received. It is impossible to see how the corporation has suffered any injury. It does not seek a rescission of the sale made by Stearns. It does not ask that the defendants shall turn back the 700,000 shares of stock still held by them and account at par for that which they have sold, tendering back to them the Big Lake stock which they through Stearns transferred to it. Nor do the individual complainants and interveners desire to surrender their stock in exchange for the money they paid for it. The corporation as well as the complaining stockholders wish to keep everything the defendants gave and take from them everything that they received. If the defendants had given nothing for the

stock and had taken it under forbidden circumstances, there would be no inequity in requiring them to hand back what they had taken. But that is not the case. Here what they gave was worth not only as much but more than the par value of what they got. If a man buys a valuable property at a cheap price—let the case be put even stronger—if a man receives a gift of a valuable property, and then turns it over to a corporation of his creation and under his control for a large sum but for no more than it is fairly worth, he taking the stock and it his property in fair exchange, must he forfeit all his interest in it if he fails to disclose to every future stockholder he invites into it that it cost him nothing? I do not think so. I find no case which so holds. In such case, while he has secured a profit, it has not been at the expense of the corporation nor any of its stockholders. It is at the expense, if anybody, of him who gave it away or sold it for a cheap price. In the instant case, as between these parties, the only loss suffered was on the part of the promoters, because whereas they owned a hundred per cent. interest in these undervalued assets before they sold them to the corporation, they owned after the sale only a six-sevenths interest. The assets now turn out to be worth about $35,000,000 more than they were sold for, and the promoters have admitted others to a share of this great increment on the basis of a contribution calculated as between themselves and these others on the theory that they owned assets worth only $4,500,000 and the others only $450,000. Thus $5,000,000 of eventual value which the promoters had in their exclusive ownership has, by their plan of organization of the defendant corporation and the sale of its preferred stock been made available for those who went in on the theory that they were buying only $450,000 worth of assets. In this way the promoters have proved to be the losers by the transaction and the complainant stockholders gainers. It is apparent why the complainants do not ask to have things restored to the *status quo ante*.

The complainants answer this apparently just argument against them by saying that the fact that the property turned out to be worth as much as the corporation paid for it to the promoters is of no materiality. In support of this answer they cite the following cases: *Western States Life Ins. Co. v. Lockwood,* 166 *Cal.* 185,

135 *P.* 496; *Victor Oil Co. v. Drum*, 184 *Cal.* 226, 193 *P.* 247;
*Holcombe v. Trenton White City Co.*, 80 *N. J. Eq.* 122, 82 *A.* 618;
*Nickel Plate Land Co. v. Broom*, 96 *W. Va.* 586, 123 *S. E.* 594;
*Chandler, v. Bacon*, (*C. C.*) 30 *F.* 538. An examination of these cases
fails, however, to sustain the proposition for which they are cited
as applicable to a state of facts such as we have before us here. A
brief statement of the facts presented by these cases will show that
they have no instant application. In *Western States Life Ins. Co. v.
Lockwood*, the liability of a promoter was not involved. The point
decided by the case was that it was not permissible for a president
of a corporation, who is also a director, to enter into a secret
arrangement with a person employed to obtain subscriptions to
its capital stock by which he is to secretly share in the profits of
such employe. A fiduciary, it is held in that case, can take no
hidden advantage of his trust, nor be permitted to take profits
out of a position of hostility to his duty. Such a principle is not
involved here in the sense it was there involved. In *Victor Oil Co.
v. Drum*, the promoters were held not to have owned the property;
they were held to be in the situation of persons buying in behalf
of the company. The court having thus found the relation of
principal and agent to exist, it was of course in obedience to fam-
iliar principles applicable to the law of agency that the actual
value of the property bought by the agent in behalf of the principal
was immaterial where the suit was to recover the difference be-
tween what the promoters paid the owner and what they got from
the corporation. But here the promoters did not buy on behalf of
the defendant company. *Holcombe v. Trenton White Co.* was an
action to assess stock for the benefit of creditors. The opinion con-
cerns itself with a discussion of the question whether anticipated
profits may be regarded as property for which stock may be issued
under the New Jersey law. Holding that the statute contemplated
property of a more tangible nature than expected earnings, the
court said that the directors in valuing property for which stock
is proposed to be issued must take into account tangible property
only, and their judgment as to its value must be viewed as of the
date when it was formed and not in the light of subsequent events.
All of this was for the purpose of ascertaining whether the property
had been so over-valued as to render the stock issued therefor

liable to an assessment for the benefit of creditors. I can see nothing in the case of value here where, as before indicated, the directors of this corporation were amply justified in valuing the property at the figure they did. In *Nickel Plate Land Co. v. Broom*, the defendants never owned the land which they sold to the corporation. There were "equitable stockholders," subscribers for stock, at the time of the sale to the corporation and these subscribers had been induced to become such on the false representation that the option which the corporation was to receive called for $20,000, whereas in truth it called for only $12,000. The company actually paid the sum of $20,000 to the owner of the land, and he in turn gave $8,000 to the promoters. Manifestly the ruling that it was immaterial what the actual value of the land was can be of no assistance in searching for the correct principle applicable here. Nor is *Chandler v. Bacon* a pertinent authority here, for the reason that the court found in substance that the defendants occupied the relation of agents to a principal in negotiating a sale of patents to their principal, from which sale the defendants secured shares of stock for nothing. The case is similar in its principle to *Victor Oil Co. v. Drum, supra,* and for the same reason as stated in connection with that case it is not regarded as of pertinent value.

The proposition is repeatedly announced by the authorities that a promoter owes a fiduciary duty to the corporation which he procures to be organized, the obligations of which continue to rest upon him so long as the corporation is in his control. But what is the nature of that duty with respect to a transaction of sale between him and it? Certainly an owner of property who wishes to form a corporation to take over the property is not restrained by the obligations of that duty from making the sale. The owner of property may "innocently," says Pitney, V. C., in *Woodbury Heights Land Co. v. Loudenslager, supra,* organize a company to buy it at an advance. No case has been found holding to the contrary. The only material particular in which it seems to me the obligations of his duty can restrain him is that he shall not receive an unfair price. This fairness of price, if the managing body is impartial and disinterested, will presumably be secured by the corporation. Where such is the situation no controversy arises.

The selling owner and the buying corporation deal at arm's length. What the promoter paid for the property, if anything, is of no concern to the corporation. But if the selling owner be also in control of the corporation, and thus in substance sits, so to speak, on both sides of the bargain, we then get into a situation which gives rise to frequent controversies. There is in that case no one capable of acting disinterestedly in favor of the corporation. What obligations rest on the promoter-owner in such case? Here is where a multitude of questions arise, questions which because of innumerable varieties of fact-conditions give occasion to the multitude of cases found in the books. In the foregoing pages an attempt has been made to point out the distinguishing features of some of these questions. Nowhere, however, do I find it laid down that if a man is the owner of property and promotes a corporation to buy it while under his control, he must as in the case of an agent acting for his principal, turn the property over to the corporation at exactly the same figure he gave for it, or for nothing if he was so fortunate as to have received it as a gift—not even in those cases which go the length of the *Bigelow Case* in Massachusetts. The principle I extract from the cases is this, that if the corporation is found not to have been competent to take care of itself in the matter of price it was paying, the court before which the transaction is reviewed will if actionable complaint is properly made do so in its behalf. No court has ever so shaped its relief against a wrong done to the corporation as vendee of property in such way as to constitute itself an instrument of wrong to the corporations' vendor. In *American Forging & Socket Co. v. Wiley, et al.*, 206 *Mich.* 664, 173 *N. W.* 515, and *Mason, et al., v. Carrothers, et al.*, 105 *Me.* 392, 74 *A.* 1030, while the promoters were held to have taken an unlawful secret profit, yet when the relief was granted a portion of the shares of stock taken in the one case was left in the hands of the promoter and a fair compensation in the other was ordered to be allowed to the promoters, as compensation for the value of services which it was considered the promoters had rendered the company. Again, in *Pietsch v. Milbrath*, 123 *Wis.* 647, 101 *N. W.* 388, 102 *N. W.* 342, 68 *L. R. A.* 945, 107 *Am. St. Rep.* 1017, the judgment of the lower court was that profits to the extent not entirely of the over-valuation should be yielded up. Some of the

over-valuation was left to be carried by the corporation. It is true that this was the judgment of the lower court, and that the appellate court had no occasion to approve or disapprove of the judgment in this respect, because of the way the case went off in that court upon the statute of limitations. I have already referred to the fact that in the case of *Bennett v. Havelock Electric Light, etc., Co.,* in Ontario, a portion of the over-valuation was left in the hands of one of the promoters.

These cases recognize that while justice is being done to the corporation the promoters may have equities in their favor which the court in administering its relief cannot in fairness disregard. It is interesting to observe how this same solicitude for the equities of the promoter-owners is manifested by the court in *Old Dominion Copper Co. v. Bigelow,* 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314. That case supplies the chief support to the complainants here. Upon the point now under consideration, I regard it as a strong authority for the defendants. In that case, and in this one, men acquired an interest in property with the clear intent at the time in the *Bigelow Case,* and, I will for the moment assume, with a like intent in this case, to sell it to a corporation to be formed. In each case the sale was made at an advance over what the promoter-owners paid for it, and in each case, though all existing stockholders approved of the transaction, it was contemplated that further innocent stockholders would be brought in. This is as far as the analogy need be carried for the present purpose. Now what was the result in the *Bigelow Case?* Let it be stated first that Bigelow and Lewisohn had bought the property for $1,000,000. They turned it over to the corporation for $3,250,000. Their profit was, therefore, $2,250,000. Having held that Bigelow and Lewisohn had obtained an unlawful profit by the transaction, what did the court hold as to its recoverable amount? It did not decide that the profit which they were under a duty to return was the difference between what they had paid and what they received, or $2,250,000. It held that they should return the difference between what they had received and what the property was worth (it being shares of stock having a market value). It was found to be worth $2,000,000, and the decree was for the return accordingly of only $1,250,000. This case, therefore, recognizes the principle

that owners of property are not bound to give up to a corporation which they promote to buy it, the advantage of a fortunate purchase which they were able to make. In its last analysis the case holds that in a sale by a promoter to the corporation under his control of property owned by him, his full duty to the corporation is complied with if he takes from the corporation a price which in the light of disinterested judgment is fair. The extent of his duty in such cases is to be fair. He is under no obligation to be generous.

The same principle is deducible from the case of *Roberson, et al., v. Draney, et al.*, 53 *Utah*, 263, 178 *P*. 35, a case which is strikingly analogous in its facts to the one here presented. There it was held that if the corporation acquires land entries from its promoters while in their control at a profit to themselves, giving stock in exchange therefor in an amount not in excess of the value of the entries, the corporation cannot be said to be injured nor is it material that the promoters reaped greater profits than other purchasers of shares.

Aside, therefore, from what might be the correct view upon the variety of questions discussed and referred to in commenting upon the cases noted in the earlier part of this opinion, it seems to me in view of what has been finally discussed to be highly inequitable to hold that the shares of stock now standing in the names of the defendants do not belong to them. Here is a case where individuals in the exercise of keen vision and shrewd judgment acquired certain tremendously valuable assets. At that time they were, as I have before observed, under no fiduciary duty to anybody. They turned these assets over to a corporation at much less than they were worth. They admitted others to a share in their good fortune. The corporation has an asset of value now appearing to be worth about $40,000,000 as against its capital stock of only $5,250,000 par value, and the complainants now have shares of stock costing $1.50 a share (taking into account the bonus of common stock which accompanied each share of preferred stock purchased by them at $3) which is valued by market transactions as high as $40 a share. The proposition of this bill is that those who have thus benefited the corporation and all the outside shareholders, shall be told by a court of equity that they must now step aside and relinquish to the exclusive enjoyment of others all the

advantages which the transfer of their own property for a fair price has made possible. As I view this case the promoters, having given full value in the form of property for their stock, are in as good a position as they would be in if they had given cash in the full amount of the par value of the stock which Stearns received. Certainly no court would upon such a state of facts as is disclosed by the bill and affidavits in this case compel the promoters to surrender all their stock and allow the corporation to keep the money paid for it. This corporation is in no better position to claim here that it can cancel the defendants' stock and keep the property which was given for it. It seems to me that to permit this result would be for this court to countenance the doing of a great inequity.

Inasmuch as upon the present showing the complainants could not secure a cancellation of the shares held by the defendants, a preliminary injunction as prayed should not issue. The rule will therefore be discharged and the restraining order heretofore issued vacated.

Let an order be prepared accordingly.