THOMAS J. ARNOLD et al.

*v.*

FREDERICK F. SEARING et al.

[Decided August 24th, 1907.]

1. Neither a corporation nor a shareholder on its behalf can complain of a fraudulent transaction to which all the stockholders assented with full knowledge of the facts.

2. A subsequent transferee of shares in a corporation, who was deceived by false representations touching the capitalization of the company, sustains an injury purely personal to himself, and not to the collective rights of the stockholders.

3. The principle that a corporation cannot complain of a transaction to which all of its stockholders assented is inapplicable unless the assent was that of the real parties in interest.

4. Defendants, as promoters of a consolidated corporation, procured options for the purchase of the property to be consolidated for $1,400,000, and, representing that the cost of these assets was $1,900,000, organized a syndicate to raise such amount, under an agreement by which the syndicate members were to receive syndicate shares each exchangeable for $10,000 of the mortgage bonds of the new company, which was to mortgage its assets for $2,500,000, and $10,000 stock as a bonus; the total capital stock being $5,000,000.—*Held,* that the members of the syndicate in effect were the stockholders of the new company for whom the promoters acted as trustees, and that the promoters were therefore accountable to them for the secret profit made by them in the purchase of the assets.

5. The new corporation having refused to sue the promoters to recover such profit, transferees of stock were entitled to sue in their capacity as stockholders on behalf of the corporation on grounds of public policy.

6. Stock in a corporation, issued as a bonus with the sale of bonds or stock issued through the means of overvaluation of the property, is not necessarily fraudulent as between the stockholders, in the absence of intervening rights of creditors.

7. In a suit to recover illegal profits made by promoters in the organization of a corporation, the non-joinder of a trust company alleged to have participated in the fraud cannot be made a ground for demurrer to the bill.

8. Where complainants were entitled to sue in their capacity as stockholders of a corporation to recover illegal profits made by promoters, and the bill prayed that defendants be decreed to pay such profits to the corporation, an allegation describing complainants as "stockholders and bondholders" of the company, and as filing the bill for and on behalf of themselves and all other bondholders and stockholders, other than the defendants, of the corporation, who should come in and contribute to the expense of the suit, should be amended by eliminating the word "bondholders."

On demurrer.

*Messrs. Humphreys & Sumner,* for the complainants.

*Messrs. Griggs & Harding,* for the defendants Searing and Fairchild.

*Messrs. Collins & Corbin,* for the defendant Bell.

Leaming, V. C.

The bill is filed by complainants as stockholders of the Passaic Steel Company to compel defendants to restore to that corporation certain secret profits alleged to have been fraudulently received by defendants as its promoters. The demurrers filed by defendants assert that any right of action based upon the fraud alleged in the bill is purely personal to complainants and not a right which may be asserted by complainants in behalf of the corporation. This contention on the part of demurrants is based on the claim that under the averments of the bill complainants cannot be treated as original non-assenting stockholders of the Passaic Steel Company, but that, on the contrary, the stock now

held by complainants must be treated as stock the owners of which, at the organization of that corporation, assented to the acts now complained of.

The bill alleges that the defendants, while holding an option for the purchase of the entire capital stock of the Passaic Rolling Mill Company (hereinafter referred to as the old company) for $1,400,000, became the promoters of a corporation to be formed to be known as the Passaic Steel Company (hereinafter referred to as the new company), to acquire the assets of the old company. The money with which the stock of the old company was to be acquired by the new company was to be raised by the means of complainants and others becoming members of a "syndicate," and each member of the syndicate paying cash for syndicate shares at a price which would realize an aggregate fund of $1,900,000. This latter amount of cash defendants falsely represented to complainants and the other contributing syndicate members as the amount for which the stockholders of the old corporation had agreed to sell its entire capital stock. The new company was incorporated and organized by defendants and its capital stock was issued (except as to thirty shares subscribed for by defendants in the certificate of incorporation) through the medium of a merger agreement between the old and new companies. Prior to the date of the merger agreement all or nearly all of the stock of the old company had been acquired or controlled by defendants with the money paid in by complainants and the other syndicate members. By the merger agreement the old company became merged in the new and the stockholders of the old company became entitled to the stock of the new to the amount named in the merger agreement, and the stockholders of the new company retained the stock then held by them, which latter stock was, as stated, merely the thirty shares subscribed for by defendants in the certificate of incorporation. While the bill does not specifically state whether all of the stock which under the terms of the merger agreement went to the stockholders of the old company, was, in fact, so issued, and a portion of it afterwards transferred to complainants and other syndicate members, or whether a part of it was issued directly to the syndicate members, the fair inference may be said to be that the

former plan was adopted. It will thus be observed that all persons to whom the stock of the new company was originally issued —that is, all of the stockholders of the two consolidating corporations were assenting parties to the transaction with full knowledge of the amount for which the old company's assets were sold. This being so, the question arises whether complainants, who appear to hold a part of the stock so issued, are entitled to complain that the new company, as such, was injured by reason of the false representations made by defendants to the syndicate members.

There appears to be no dissent to the general proposition that a corporation cannot complain of a transaction to which all of its stockholders assent with full knowledge of the facts, and if the corporation cannot complain it necessarily follows that a shareholder cannot on behalf of the corporation. It also appears to be well settled that a subsequent transferee of shares, who is deceived by false representations touching the capitalization of a company, sustains injury purely personal to himself; such an injury is not to the collective rights of the stockholders. *Morawetz Priv. Corp.* §§ *290, 291, 292.* But the principle that a corporation cannot complain of a transaction to which all of its stockholders assent necessarily embodies the idea that the assent is upon the part of the real parties in interest. One who, in fact, though not in form, occupies the position of a non-assenting stockholder should not on any theory of unanimous consent be barred the assertion of his rights as such. The real relation of complainants to the new corporation at the time of the merger is, in my judgment, dependent upon an accurate conception of the syndicate agreement already briefly referred to. If that agreement was, in effect, a mere engagement upon the part of defendants to sell to the syndicate members certain stock of a proposed corporation to be capitalized in a defined manner, any injuries sustained by the syndicate members by reason of misrepresentations upon the part of defendants touching the cost or value of the assets which the proposed corporation was to own might well be urged as injuries purely personal to the persons to whom the false representations were made, as distinguished from injuries to the collective rights of stockholders, and that such

false representations could not be made the basis of a suit of this nature. But the syndicate transaction, as defined by the bill, embodied other essential elements. The money supplied by the syndicate contributors was not money for the purchase of stock from defendants, but was the money with which the assets of the old company were to be acquired by the new. It was the money which was, in effect, to form the capital of the new company with which it was to acquire the assets of the old. Defendants were not selling to the syndicate members anything which they owned or were to own. The so-called syndicate was merely an aggregation of persons whom defendants induced to supply these funds for the purpose named. The "syndicate shares" referred to by the bill, as sold by defendants to the several syndicate members, simply represented the proportionate parts which the several syndicate members were to own in the aggregate amount of stock and bonds of the new company, capitalized on the basis proposed, which was to go to the syndicate members. In selling syndicate shares defendants were, in effect, soliciting contributions to the capital of the new company. They were in no sense vendors or parties to a contract of sale. While the members of the syndicate did not sign any formal subscription for the stock of the new company, and may not have received their stock directly from the new company, they in fact supplied the money which was to form the capital of the new company with which it was to acquire the assets of the old and on which its stock issue was to be based. The method in which this was to be accomplished was entrusted by the syndicate members to defendants. Under these conditions the members of the syndicate must be regarded as equitably the original subscribers for this stock to essentially the same extent as though the transaction had consisted of formal stock subscriptions by the several syndicate members. The syndicate members thus became the real parties in interest. They were, in substance, the stockholders, even though the transaction was managed in such manner and took such form that at the time of the consolidation of the two companies the syndicate members did not appear· on the face of the transaction as parties in interest. To them (the syndicate members) defendants represented that they held options covering the assets of the old com-

pany at $1,900,000, when, in truth, the options called for but $1,400,000, and the latter amount was the amount actually paid, with the result that defendants received and the new company lost, the benefit of the difference, as the money was supplied by the syndicate members for the new company. The syndicate members entrusted defendants with the organization of the new company in a way that should carry out the plans proposed. In carrying out these plans defendants operated with a free hand and completed the organization of the new company and made the distribution of its stock and bonds among the syndicate members without restraint, controlling the boards of directors of both the old and the new companies at the time of the merger agreement. I think the bill clearly discloses that defendants were essentially trustees for the members of the syndicate, and their fiduciary relation necessarily extended to the new corporation which they were promoting, not alone as its promoters, but also because it is quite impossible to distinguish between the syndicate members and the proposed corporation which they were capitalizing. The injury to complainants through the false representations made by defendants, was, in my judgment, an injury to them in their corporate rights.

Demurrants also urge that complainants come into court without clean hands and cannot in consequence ask the affirmative aid of this court. This claim necessitates an examination of other details of the syndicate agreement. By the syndicate agreement there were to be two thousand syndicate shares of the par value of $10,000 each, making a total of $2,000,000. Each syndicate share was to be exchangeable for $10,000 of the mortgage bonds of the proposed new company (the mortgage to be for $2,500,000) and for $10,000 of stock of the proposed new company (total stock to be $5,000,000). The bill avers that of the $10,000 in mortgage bonds and $10,000 in stock which each $10,000 syndicate share was to receive, the stock was regarded as a "bonus." These syndicate shares of $10,000 each were to be taken by the members of the syndicate for $9,500 in cash, which made the total cash to be paid in by the syndicate members $1,900,000, that being the amount represented by defendants as the amount to be paid to the owners of the stock of the old com-

pany. It will thus be seen that the plan contemplated by the
syndicate members was that the new company should take over
the assets of the old by the purchase of those assets with the
$1,900,000 provided by the syndicate members and issue mort-
gage bonds to the syndicate members for $2,000,000 and bonus
stock for a like amount. Is there to be found in this plan such
unconscientious conduct as will operate as a bar to equitable
relief at the instance of complainants? I think not. Stock
issued as a bonus with the sale of bonds, or stock issued through
the means of overvaluation of property cannot properly be re-
garded as necessarily issued fraudulently. In the absence of
intervening rights of creditors such transactions appear to have
been generally supported by the courts unless positive fraud has
been clearly established, notwithstanding the constitutional and
statutory provisions of many of the states designed to secure a
proper relationship between the capital stock and the assets of
corporations. See *1 Cook Corp.* §§ *46, 47,* where the authorities
at common law and under the statutes and constitutions of the
several states are collected. *Scovell* v. *Thayer, 105 U. S. 143,
153; Hebbard* v. *Southwestern Land and Cattle Co., 55 N. J.
Eq. (10 Dick.) 18.* Complainants are *de facto* stockholders.
The management of the corporation will not sue. To whatever
extent the syndicate plan may be said to be violative of the spirit
of our legislation touching the issuance of stock, I think the case
presented by the bill is one in which public policy may be said
to be promoted by allowing complainants to sue in behalf of the
corporation for the restoration of the assets alleged to have been
fraudulently appropriated by defendants. *1 Pom. Eq. Jur.*
§ *403.*

The failure of complainants to make the Citizens' Trust Com-
pany a defendant is also urged by demurrants as fatal to the bill.
The bill does not aver that the Citizens' Trust Company was a
party to the fraud. But even regarding that company as a co-
conspirator and participator in the results, the non-joinder can-
not be made a ground of demurrer. *Stockton, Receiver,* v. *An-
derson, 40 N. J. Eq. (13 Stew.) 486.*

Another ground of demurrer is that complainants in the in-
troductory part of the bill describe themselves as stockholders

and bondholders of the Passaic Steel Company and as filing the bill "for and on behalf of themselves and all other bondholders and stockholders (other than the defendants) of said company who shall come in and contribute to the expense of this suit." But it will be seen that the theory of the bill is that of a stockholders' bill. The specific relief prayed for is that defendants may be decreed to be liable to the Passaic Steel Company for the secret profits which they made while acting as promoters of that company and that they may be decreed to pay the same to that corporation. It is manifest that complainants have no standing in the suit except in their capacity as stockholders, and that they have not intended to assert a right in any other capacity or for the benefit of merely such persons as were both bondholders and stockholders. I think the language of the bill above quoted should be treated as an inadvertence, and that the bill should be considered as amended by the elimination of the word "bondholders" wherever it appears in the introductory part of the bill. This request was made by complainants at the hearing and should be allowed.

The other grounds of demurrer were not urged at the hearing and will not be considered.

I will advise a decree overruling the demurrers.