T. E. BIRBECK, M. V. MENDOSE and R. M. PRICE,

*vs.*

AMERICAN TOLL BRIDGE COMPANY OF CALIFORNIA, a corporation organized and existing under the laws of the State of Delaware, AMERICAN TOLL BRIDGE COMPANY, a corporation organized and existing under the laws of the State of Delaware, and AUDREY V. HECK.

*New Castle, August 8, 1938.*

*Christopher L. Ward, Jr.* of the firm of Marvel, Morford, Ward & Logan, for complainants.

*Clarence A. Southerland,* of the firm of Ward & Gray, for all defendants.

*Harold H. Holmes, Jr.,* for American Toll Bridge Co. of California and Audrey V. Heck.

*Benjamin I. Aiken,* for American Toll Bridge Co.

THE CHANCELLOR: American Toll Bridge Company of California will be herein referred to as Holding Company, and American Toll Bridge Company as Operating Company.

The controversy has its origin in events which occurred in the year 1923. Prior to that year and since 1917, a California company called Rodeo Vallejo Ferry Company, herein referred to as Ferry Company, was engaged in operating a ferry for the transportation of automobiles between the counties of Contra Costa and Solano, across the waters of Carquinez Straits near San Francisco, California, the outlet of the Sacramento and San Joaquin Rivers into San Pablo Bay. By January, 1923, it operated three ferry boats across those waters. Aven J. Hanford and Oscar H. Klatt were the organizers and managers of the Ferry Company, the former being its president and general manager and the latter its secretary throughout the period of the events about which the bill complains. The Ferry Company was capitalized at five hundred thousand dollars, its stock having a par value of one hundred dollars per share.

Prior to January 8, 1923, the directors of the Ferry Company learned of a project entertained by others to construct a toll bridge across the waters over which its ferries plied. If such a bridge was built, it would mean a total loss of the Ferry Company's business. It was concluded therefore that the Ferry Company should endeavor to erect the bridge and thus save itself from extinction. This is an important fact in the case, for the activities which ensued on the part of the Ferry Company's two principal officers, Hanford and Klatt, and its director and vice-president, Clyne, are properly ascribable to their agency in prosecuting the Ferry Company's business of acquiring the bridge and thereby warding off the company's destruction.

It was necessary to secure a franchise from the proper authorities and to acquire property for the bridge heads at the termini on the shores. It appears that the Ferry Com-

pany already possessed the land necessary for the bridge head on the southern shore. It had to acquire a bridge head site on the northern shore. An application for a franchise was made and Clyne was instructed by the directors to secure an option on land for the north bridge head. He secured an option on fifty-five acres, the price to be ten thousand dollars. Rival applicants for a franchise offered the land owner fifteen thousand dollars. Thereupon Clyne, at the direction of Hanford and Klatt, raised his bid to fifteen thousand five hundred dollars and made the purchase immediately. Hanford and Klatt each paid him five thousand dollars, he ultimately receiving five thousand dollars in stock of the Holding Company which was not yet incorporated or, so far as appears, not yet projected. It was necessary for hasty action in the purchase, because the applicant for a franchise who possessed a bridge head on each shore was manifestly in greater likelihood of being favored than one who had a bridge head site on only one shore. The result of this quick action on the part of Clyne was that the county authorities granted a franchise to the Ferry Company—not to Clyne or to Hanford or to Klatt. The evidence does not expressly show it, but it seems to me the inescapable inference must be that it was represented to the county officials that the bridge head site which Clyne had bought was acquired for the Ferry Company. If it were not so, how could the acquisition have been the tilting fact in favor of the Ferry Company's application for a franchise? I mention this circumstance as one which combined with Klatt's original instructions, refutes the claim now made by the defendants that the purchase of the fifty-five acre tract was a transaction which was consummated entirely independently of any supposed agency on behalf of the Ferry Company as the principal and beneficiary.

Clyne did not take title to the tract. The title was put in a straw-man, an employe of the Ferry Company. Later Klatt became the grantee from him, and in turn conveyed

the tract to the Holding Company under the circumstances hereinafter mentioned.

Now while the Carquinez bridge project was in agitation, the directors of the Ferry Company learned that there was talk of another bridge project across the San Joaquin River, about forty-five miles up stream from the Ferry Company's property where the Carquinez bridge was to be located, near the town of Antioch. The Ferry Company considered that a bridge at that point would be in dangerous competition with the proposed Carquinez bridge. Something should be done about it. Accordingly Klatt organized a company called the Delta Bridge Company which had an imposing capital structure but had only five hundred dollars worth of its stock issued, representing an investment of about one hundred and twenty-five dollars. This company made application to the proper authorities for a franchise to construct a bridge at Antioch. Klatt owned the company. Whether he organized it in behalf of the Ferry Company does not appear. Certain it is, however, that when he organized it, he was an officer and director of the Ferry Company, and that its organization was in furtherance of the Ferry Company's general plan of protection against competition.

The Ferry Company was a small local company, the stockholders of which numbered two hundred and fifty. The project of building a bridge at Carquinez Straits was in itself an ambitious one for the Ferry Company, and of course if another bridge at Antioch was placed on its agenda, its financing problem would be greatly enlarged. It was concluded that the necessary financing which would have to run to at least a million dollars could be better arranged through a new corporation. Accordingly the Ferry Company's attorney Mr. tum Suden, was instructed to prepare the necessary papers for the incorporation of a ten million dollar California corporation. He did so. When he advised Hanford, president of the Ferry Company, that the papers were ready, he was informed that Klatt and

another lawyer had gone East about the matter. Mr. tum Suden's services were dispensed with. Klatt's activities in the East, at Philadelphia, Pa., resulted in the incorporation of the Holding Company and the Operating Company under the laws of this State and the transaction between them hereinafter mentioned. This was in May, 1923.

In the interval between the securing of the Carquinez franchise on January 8, 1923, and Klatt's journey to Philadelphia, Klatt, assisted apparently by Hanford, but particularly Klatt, was active in explaining to the Ferry Company's stockholders the necessity of a new corporate setup for financing the bridge program. He met with a group of stockholders and interviewed individuals. His proposal to them was that each Ferry Company stockholder should exchange Ferry Company stock for a new company's stock on a dollar for dollar basis, receiving in the new company the same proportional holdings as was held in the old. The meaning of this was plain. It could not have been other than that the new company would start off with the same stockholders holding the same proportional ownership as were in the Ferry Company and that any new stockholders that came in would do so only as a result of their supplying new funds with which to finance the erection of the proposed bridge or bridges.

On this representation Klatt succeeded in securing from Ferry Company stockholders control of ninety per cent of its stock. The control so secured was for the purpose of exchange only. Every witness who testified so stated. Klatt did not buy the stock. He was to exchange it as arranged or return the stock to the respective owners. He himself was the registered owner of a little over two hundred shares. His own shares together with the shares delivered to him for exchange constituted ninety per cent of the entire outstanding Ferry Company shares, viz., forty-five hundred of the five thousand issued.

Thus when Klatt journeyed to Philadelphia he owned his own shares which, with the shares entrusted to him by the stockholders for exchange, constituted ninety per cent of the Ferry Company's outstandig stock; he controlled the five issued shares of Delta Bridge Company's stock; and he had title to the fifty-five acre tract on which one of the bridge heads was to be located at Carquinez. The Ferry Company owned the franchise at Carquinez Straits and Delta Bridge Company owned an application for a franchise at Antioch, whatever that might be worth. Klatt also represented in the offer hereinafter referred to, that he owned or controlled approximately one acre of land (to be exact it was about nineteen-hundredths of an acre) in Solano County, which was a proposed site for a bridge head near the town of Antioch.

Klatt arrived in Philadalphia in May and caused the two Delaware corporations to be organized. The Holding Company was capitalized for seven hundred and fifty thousand shares of Class A common stock (par of one dollar per share) and ten thousand shares of Class B common stock without nominal or par value. Class B stock has the sole voting power. When dividends are declared, Class B as a class is entitled to receive the same amount as Class A as a class. The Operating Company was capitalized for five million shares, each of the par value of one dollar.

On May 28, 1923, the Holding Company, apparently while still in the control of the dummy organizers, entered into the following transaction with Klatt.

Klatt made an offer to it, as follows:

"May 28, 1923
"American Toll Bridge Company of California.
"Philadelphia, Pennsylvania.

"Gentlemen:

"I am the owner of, or have control of the following real and personal property, to-wit:

"1. Approximately ninety per cent of the capital stock of Rodeo-Vallejo Ferry Company.

"2. Fifty-five acres of land in Solano County upon which it is proposed to locate one of the bridge heads of the toll-bridge, the franchise for which was recently granted by the Board of Supervisors of Contra Costa County to the Rodeo-Vallejo Ferry Company.

"3. Approximately one acre of land, more or less, near the town of Antioch, Solano County, California, upon which it is proposed to locate one of the bridge heads of the toll-bridge across the San Joaquin River, the franchise for which has been applied for by the Delta Bridge Company.

"4. Application to build and operate toll-bridge across the San Joaquin River near the town of Antioch, California.

"5. All of the issued capital stock of Delta Bridge Company, a corporation.

"I hereby offer to convey to your company all of the said real and personal property, together with said franchise when obtained, in exchange for all the capital stock in your company, except ten shares heretofore subscribed for and now owned by members of your board of directors.

"Expecting an early reply to the foregoing offer, I remain,

"Yours very truly,
"Oscar H. Klatt."

Thereupon the directors accepted the offer and authorized the issuance to Klatt of all the capital stock except ten shares then owned by the directors upon his delivery and transfer of the assets mentioned in his letter. The delivery was made and the stock issued to Klatt. Klatt arranged for the Holding Company to issue to the various Ferry Company stockholders certificates for Class A shares in exchange for Ferry Company's stock which had been delivered to him for exchange. In the main, Class A shares of the Holding Company were exchanged on a dollar for dollar basis, that is to say a person owning one share of Ferry Company stock of one hundred dollars par value received one hundred shares of Holding Company Class A stock. In a few instances he was compelled to make the exchange on a one and one-half to one basis, and in a few on a two to one basis. Klatt kept for himself all the remaining shares. Thus Klatt came out of the transaction holding

approximately two hundred and fifty thousand shares of the Class A stock and the entire ten thousand shares of Class B stock. No attack is made by the bill against his acquisition of the shares of Class A stock. The sole attack is against his acquisition of the ten thousand shares of Class B stock which carry not only voting control of the Holding Company but participate equally with the entire issue of seven hundred and fifty thousand dollars of Class A stock in the earnings.

The Holding Company sold all the assets acquired under the Klatt offer to the Operating Company in exchange for all of the latter's stock. It was through the sale of the Operating Company's stock that it was hoped funds would be raised in sufficient amount to construct the bridges. The Holding Company retained enough of the Operating Company's stock, however, to assure it of control. The details of the financing need not be described. It is sufficient to say that from sales of the Operating Company's stock and from the proceeds of a bond issue, the bridges were ultimately erected. Pending the construction, the Holding Company operated the ferries of the Ferry Company. The Ferry Company was kept alive and still continues to exist as a corporation.

Klatt transferred to Hanford, president of the Ferry Company, one-half of the Holding Company's ten thousand Class B shares which he had secured under the circumstances above detailed. Hanford bequeathed them to his widow, the present defendant, Mrs. Heck. The five thousand shares which Klatt retained are now held by the Operating Company, which acquired them under circumstances which need not be recited.

Some few, very few, of the stockholders of the Ferry Company became curious to know just what the result of all these activities was. The different basis of exchange between what a few had been favored with, excited com-

ment among those who learned of it. Klatt assured every inquirer that everything was all right. Mr. tum Suden, the Ferry Company's former attorney, was particularly persistent in prying into the events that had transpired. At first he could get no satisfactory response to his inquiries.

Dividends were declared by the Holding Company in 1923 and 1924. Klatt and Hanford, however, who then owned all the Class B stock, waived the payment of dividends thereon during two years, thus contributing to the concealment of the fact of the Class B stock's highly favored position with respect to dividends. The Holding Company rendered no statements showing the Class B stock's right. The stockholders were never informed of who held it or of the circumstances attending its issuance. When Clyne and tum Suden learned that the Class B stock had been acquired by Klatt, they were assured by the latter that everything was all right, that the purpose of the Class B stock was to secure voting control to the old Ferry Company's stockholders, that it really belonged to them, and in substance that they would be fairly dealt with.

Klatt was able to keep matters fairly secret within his own little coterie of associates. When dividends were declared on the two classes of stock in December, 1936, however, and it became openly known that the ten thousand Class B shares received as much of a dividend as all of the seven hundred and fifty thousand shares of Class A received, the protest was made which the present bill embodies.

The foregoing are, in the main, the salient facts in this case. The bill charges that the ten thousand shares of Class B stock which Klatt received, represent a secret profit which he obtained at the expense of the Ferry Company's stockholders whom he represented in the matter of exchanging their shares in the Ferry Company for shares in the new company which was to be formed. That the bulk of what Klatt received is properly describable as a profit

is manifest when what he personally contributed to the Holding Company is compared with what he received from it. What did he give? If we treat the bridge head site of fifty-five acres as an asset which he acquired in his own independent right and not as the agent of the Ferry Company and its stockholders, its value was not much, if any, in excess of fifteen thousand five hundred dollars. The Delta Bridge stock could not have been worth over the value of its capital of five hundred dollars, because its only pretended asset was an application for a franchise. It is difficult to ascribe anything of value to a mere application. The nineteen-hundredths of an acre of land near Antioch could not have been of great value. Finally, of the ninety per cent of the Ferry Company's stock of which Klatt was the owner or had control, as his offering letter stated, he personally owned only a little over two hundred shares—I think, without searching through the lengthy record to verify it, the number was about two hundred and forty-three. If that was the number, the value for exchange purposes was twenty-four hundred and thirty dollars—call it the round figure of twenty-five hundred dollars. The remaining ninety per cent of the Ferry Company's stock belonged to other Ferry Company stockholders for whom Klatt was acting as a mere exchange agent.

Now the total of values which Klatt personally gave for the Class A and Class B stock which he received, as appears from the foregoing list and being liberal in estimating the nineteen-hundredths of an acre at Antioch, cannot far exceed, if it can exceed at all, twenty thousand dollars. For this he received in the neighborhood of three hundred thousand Class A shares of a capital value of three hundred thousand dollars and in addition the highly attractive ten thousand shares of Class B common stock. The Ferry Company's stockholders who went into the corporation with him at his solicitation, contributed four hundred and fifty thousand dollars of value and recived a corresponding dollar

value of Class A stock. And, furthermore, the stock they received was required to divide the earnings on an equal basis with Klatt's Class B shares.

There undoubtedly was a profit to Klatt, and I think it is not speaking the language of hyperbole to say that the profit was glaringly shocking.

But, if the deposition of Miller be accepted, the profit to Klatt was even more, as the sequel shows; for according to Miller, when the fifty-five acre tract of land was deeded to the Operating Company, Klatt received forty thousand dollars in cash.

The transactions out of which Klatt reaped his large profit were transactions which he conducted as the agent for the Ferry Company's stockholders whose stock certificates he held for purposes of exchange into shares of a new company. In one sense the business he was active in conducting was the business of the Ferry Company, of which he was a director and officer, in that the goal of his activity was the saving of the Ferry Company from the destructive competition of threatened toll bridges. This means, however, that the ultimate end sought to be achieved was the saving of the Ferry Company's true owners, its stockholders, from loss of their investment.

The mechanics of the plan which was adopted required that it should be effectuated by what in substance was a subscription by the Ferry Company's stockholders for the capital stock of the proposed new company, the subscription to be paid for by stock of the Ferry Company as the consideration.

The Ferry Company's stockholders were therefore in contemplation of equity subscribers for the Holding Company's stock. If Klatt be regarded as the promoter of the Holding Company, he was such as the agent for the Ferry Company's stockholders who had entrusted their stock to

him for exchange. The land he acquired was unquestionably acquired in behalf of the Ferry Company and its stockholders, in furtherance of the bridge project which that company had adopted. Practically everything of real value which Klatt transferred to the Holding Company, he had acquired in his capacity as agent for the Ferry Company or its stockholders.

I just said that the Ferry Company's stockholders were to be considered as subscribers to the stock of the Holding Company. They are properly describable as equitable stockholders, as the courts have frequently said in cases of this sort, where it is charged that the person playing the role of a promoter in the organization of a corporation which a group of subscribers are to go into, secretly obtains a profit for himself at the expense of the group for whom he was acting as the common agent. In *Nye Odorless Incinerator Corp. v. Felton, et al.*, 5 *W. W. Harr.* (35 *Del.*) 236, 246, 162 *A.* 504, 509, Judge Rodney said, that subscribers for stock in a corporation, though not technically stockholders, "must be considered either as equitable stockholders, potential stockholders, or given some other name which would indicate that they had rights in the corporation at the time" the wrongs complained against were committed.

Klatt is to be considered as the promoter of the corporation. As such he owed a duty to its equitable stockholders not to take a secret profit from it at their expense. If he did so, he is accountable to the corporation. This principle was recognized in *Henderson, et al., v. Plymouth Oil Co., et al.*, 16 *Del. Ch.* 347, 141 *A.* 197, affirming 15 *Del. Ch.* 40, 131 *A.* 165, and in *Nye Odorless Incinerator Corp. v. Felton, supra.* See also, *Yeiser v. U. S. Board & Paper Co.*, (6 *Cir.*) 107 *F.* 340, 46 *C. C. A.* 567, 52 *L. R. A.* 724; *Woodbury Heights Land Co. v. Loudenslager*, 55 *N. J. Eq.* 78, 35 *A.* 436; *South Joplin Land Co. v. Case*, 104 *Mo.* 572, 16 *S. W.* 390; *Arnold v. Searing*, 73 *N. J. Eq.* 262, 67 *A.* 831; *Id.*, 78

*N. J. Eq.* 146, 78 *A.* 762; *Davis v. Las Ovas Co.,* 227 *U. S.* 80, 33 *S. Ct.* 197, 57 *L. Ed.* 426; *California-Calaveras Mining Co. v. Walls,* 170 *Cal.* 285, 149 *P.* 595; *Tilden v. Barber,* (*D. C.*) 268 *F.* 587.

I have frequently referred to Klatt and his activities. He was the secretary of the Ferry Company and one of its directors. Hanford, its president, was associated with him and, according to the evidence, participated in some at least of his activities. He shared with Klatt in an equal division of the ten thousand shares of Class B stock, which represented a very substantial slice of the profits which Klatt has skimmed off the agency. The inference from the evidence is justified that Hanford had knowledge of all that was being done, and that what he received from Klatt was a part of Klatt's unconscionable profit. Hanford's widow who as his legatee is a pure volunteer as to the five thousand shares of Class B stock held by her, cannot be regarded as a *bona fide* purchaser for value. Neither can the Operating Company which now holds the other five thousand shares of Class B stock be regarded as such purchaser. It was the creation of Klatt who organized it contemporaneously with the Holding Company and must be regarded as knowing all that he knew.

It is to be observed, too, that if Mrs. Heck and the Operating Company rely as a defense on a supposed status of purchasers for value without notice, the burden is on them to sustain their side of that issue. *Blair v. F. H. Smith Co., et al.,* 18 *Del. Ch.* 150, 166, 156 *A.* 207, 213; *Cieniewicz v. Sliwka, et al.,* 15 *Del. Ch.* 192, 133 *A.* 695; *Id.,* 14 *Del. Ch.* 362, 128 *A.* 527; *Dick v. Doughten,* 1 *Del. Ch.* 320. They have not offered a word of testimony in an attempt to do so.

It is essential, of course, that before secret profits are recoverable in behalf of the corporation and in the last analysis for its stockholders, the latter must have been in ignorance of the fact of the profit. The word "secret" im-

plies as much. Where there is ignorance there is no consent. Secrecy is of importance as negative consent. The innocent stockholders of the Ferry Company were densely ignorant of what Klatt and Hanford were doing in the way of profiting themselves. The defendants stress the fact that because the Class A stock certificates which the old Ferry Company's stockholders received showed on their face that ten thousand shares of Class B stock were authorized to be issued, the Ferry Company's stockholders were put on notice of its existence. That they are to be supposed to have known the fact that the corporation had the right to issue ten thousand shares of Class B stock, must be taken as true. But how were they supposed to know that Klatt and Hanford had appropriated those shares to themselves? If they knew that Klatt and Hanford held them, they were under no duty to suspect Klatt and Hanford of having acquired the shares under circumstances which would show fraud, and thereupon to search through the records of the corporation and run down the facts for confirmation of their suspicions. *Rice & Hutchins v. Triplex Shoe Co., et al.,* 16 *Del. Ch.* 298, 147 *A.* 317; *Cahall, Rec'r., v. Burbage,* 13 *Del. Ch.* 299, 119 *A.* 574; *Cahall, Rec'r., v. Lofland, et al.,* 12 *Del. Ch.* 299, 114 *A.* 224. The recipients of the profit made no disclosure of the facts. The corporation made none. The recipients, by their waiver of dividends on the Class B stock in 1923 and 1924, avoided the exposure which but for the waiver would then have ensued in all probability. It was only when the dividend of December, 1936, was declared on the Class B stock that the ugly facts became exposed.

I can discover no ground for applying the doctrine of laches in this case. To do so would be to protect persons who have no higher equity than had the original wrongdoers, themselves, who, as I see the case, instead of having any equity in their favor, were burdened with an unusually heavy weight of inequity. The fact that many transfers have been made of the Class A stock is of no moment. I

do not see the point of the evidence in that regard, for if the Class B stock is cancelled, such transferees will not be harmed. They will be benefited. The complainants were without knowledge of the wrongs and there were no circumstances putting them on notice to make inquiry.

An account should be taken to ascertain what cost, if any, Klatt and Hanford were put to personally in the acquisition of the Class B stock, and upon ascertaining the proper reimbursement to them on account thereof, the shares should be surrendered for cancellation.

Decree accordingly.